1

2

3

4

5

6                    UNITED STATES DISTRICT COURT

7                   EASTERN DISTRICT OF CALIFORNIA

8

9   ZELLA MAYE FREEMAN,            )    1:05-cv-0328 OWW SMS
                                    )
10            Plaintiff,           )    MEMORANDUM DECISION AND
                                    )    ORDER GRANTING/DENYING
11       v.                        )    DEFENDANTS' MOTION FOR
                                    )    SUMMARY JUDGMENT
12  CITY OF FRESNO, R. GARRISON    )
    (F.P.D. Badge No. 780), MARK A. )
13  YEE (F.P.D. Badge No. 692), J. )
    CAPRIOLA (F.S.O. Badge No.     )
14  7622), I. BARRIMOND (F.S.O.    )
    Badge No. 1153), J. HOLLINS    )
15  (F.S.O. Badge No. 2346), R.    )
    PEREZ (F.S.O. Badge No. 6169), )
16  A. SIMONSON (F.S.O. Badge No.  )
    9364), inclusive,              )
17                                  )
             Defendants.           )
18                                  )
   _____ )
19

20

21              I.   INTRODUCTION

22       Plaintiff Zella Maye Freeman ("Freeman" or "Plaintiff")

23  filed a complaint against Defendants for their alleged

24  unreasonable search and seizure of her home in violation of her

25  federal civil rights, as well as various state laws.  (Doc. 1,

26  Complaint, Filed March 8, 2005.)  This action comes before the

27  court on Defendants' motion for summary judgment of Freeman's

28  claims.  (Doc. 61-2, Motion for Summary Judgment, Filed July 31,

                              1

1 | 2006.)  Freeman opposes the motion.  (Doc. 89, Pl.'s Amended
2 | Opp., Filed October 4, 2006.)

3 | II.  PROCEDURAL BACKGROUND

4 | Freeman filed her initial complaint on March 8, 2005.  (Doc.
5 | 1, Complaint.)  On June 28, 2005 Freeman amended her complaint.
6 | (Doc. 24, First Amended Complaint.)  On July 31, 2006 Defendants
7 | filed a motion for summary judgment.  (Doc. 61-2, Motion for
8 | Summary Judgment.)  Freeman opposed the motion on October 2,
9 | 2006.  (Doc. 81, Pl.'s Opp. to Mot. for Summary Judgment.)
10 | Freeman then filed an amended opposition on October 4, 2006.
11 | (Doc. 89, Pl.'s Amended Opp.)  Defendants filed their reply on
12 | October 16, 2006.  (Doc. 96, Def's Reply.)

13 | III.  FACTUAL BACKGROUND

14 | A.  UNDISPUTED FACTS

15 | 1.  Facts Relevant to Obtaining the Search Warrant

16 | During his assignment with the Multi Agency Gang Enforcement
17 | Consortium ("M.A.G.E.C."), Detective Mark Yee along with several
18 | other investigators, became involved in a one and a half year
19 | investigation of criminal activities including gang-related
20 | shootings, homicides and attempted homicides committed by rival
21 | African American gangs in the southwest Fresno area.  (DSUF, No.
22 | 2)  Specifically, the investigation focused on validated criminal
23 | street gangs the "West Side Strother Boys", its gang leader
24 | Darryl "Dedo" Hilliard, and their rival, "the Garrett Street
25 | Gang."  (DSUF, No. 3)

26 | In February 2004, Detective Yee authored a thirty one page
27 | search warrant affidavit, arising out of the investigation
28 | stemming from the gang related shootings by the subject gangs.

(DSUF, No. 5)   The Search Warrant Affidavit was signed by Detective Yee under penalty of perjury.  (DSUF, No. 7)  At that time, the West Side Strother Boys was still an active gang committing violent crimes and there were investigations outstanding.   (DSUF, 8)   The Affidavit provided specific details of incidents during that investigation.

    2.   Detective Yee's Investigation

        i.   History of Yee's One and a Half Year Investigation in Support of Probable Cause

        It is undisputed that the record contains an extensive account of various incidents of violence between the Strother Boys and the Garret Street gang.  These incidents were described in Yee's twenty four page statement of probable cause in support of the Search Warrant.  Yee's affidavit provided specific details of incidents that included the following[1]:

1.   shots fired at Strother Boys Gang on November 19, 2002,

2.   shots fired at Garret Street Gang on November 20, 2002,

3.   the shooting of a six year old boy shot in the crossfire between Srother Boys and Garret Street gangs on December 26, 2002.

4.   Strother Boy Darryl Hilliard's Fingerprints on a firearm at a disturbance on March 5, 2003,

5.   Shootout between Darryl Hilliard and Garret Street Boys on March 11, 2003, and

6.   Garret Street Gang member shot on January 29, 2004.

---

    [1] For an exhaustive list of the incidents and the details of each incident see Doc. 61, Def.'s Motion for Summary Judgment, Filed July 31, 2006, pp. 5-16.

1          **ii.   Detective Yee's Conclusions of the Investigation**

2          Detective Yee, who has been an officer with the Fresno

3   Police Department since 1994, was assigned to the M.A.G.E.C. Unit

4   in 1997.  (DSUF, No. 236)

5          In addition to the information described above, along with

6   confidential information[2] contained in a sealed portion of the

7   affidavit, Detective Yee relied on the following in seeking

8   authorization to search the ten residences:

9          1.   There was a long-standing and ongoing feud between
                members of the "West Side Strother Boys" and "The
10               Garrett Street Boys" and that feud involved many
                acts of violence on both sides.  (DSUF, No. 42)
11
12         2.   Detective Yee knew that the Strother Boys were a
                close knit group, and that it was not uncommon for
                many of the members to be involved in related acts
13               of violence.  (DSUF, No. 43)

14         3.   When an ongoing feud involving many separate
                members of the same gang exists, it is not
15               uncommon for the violent members at the central
                core of the gang to associate with each other, and
16               to plan together aggressive acts and/or acts of
                violent retaliation to be perpetrated by a few
17               members of this violent central cadre.  (DSUF, No.
                44)
18
19         4.   The pattern of violent acts perpetrated by "The
                West Side Strother Boys" and the large number of
20               people involved in these acts, made it more likely
                than not that there was a general common plan
21               existing among the gang to commit acts of violence

22

23         [2] It is undisputed that Detective Yee requested the
    confidential portion of the affidavit be sealed under *People v.*
24   *Hobbs*, 7 Cal. 4th 948 (1994) in order to protect the safety and
    welfare of the confidential informant(s).  (DSUF, No. 54.)  It is
25   also undisputed that, according to Freeman's police practices
    expert, Roger Clark, requesting to seal a portion of an affidavit
26   should be done very carefully, so as to protect the confidential
    sources, because people can die if such information is disclosed.
27   (DSUF, No. 55.)  It was Detective Yee's practice never to break
    this promise.  (*Id.*)
28

against persons they believed to belong to or to associate with their rivals.  (DSUF, No. 45)

5.   In a long-standing gang shooting feud, members of the victim's gang in one shooting frequently know or suspect that they know who the perpetrators are.  This is because of the "word on the street", which is information passed from person to person, often based on sources within the perpetrator's gang; on eyewitnesses reluctant to cooperate with the police; or on gang graffiti, composed of writings on buildings or walls, which is a means used by some gang members to take credit for a violent incident.  (DSUF, No. 46)

6.   Because of the above, a person involved as a shooter in a gang-related feud incident will generally assume his identity is known on the streets.  (DSUF, No. 47)  While he must temporarily dispose of the weapon used in the underlying offense, he must at the same time have accessible to himself a weapon which can be used for self-defense upon short notice.  (*Id.*)

7.   That gang members who are involved in an ongoing feud of shooting incidents frequently do not permanently dispose of their weapons, preferring to retain access to them for protection from retaliation or for further use in acts of aggression while the feud is continuing.  (DSUF, No. 48)

8.   Gang members who use a firearm in gang feud situations frequently borrow the weapon used from a fellow gang member, and after the commission of a violent act with the weapon, they return it to the gang member they borrowed it from, to prevent it being seized by law enforcement officers during a search conducted shortly after the commission of the crime.  (DSUF, No. 49)

9.   Gang members who do use their own firearms in gang war situations frequently pass the weapons used to fellow gang members for safe keeping, in order to avoid the weapon being seized by law enforcement officers during a search of their residence, vehicle or person.  (DSUF, No. 50)

10.  When a gang member in the above situation believes that he is no longer liable to be searched as a suspect in the shooting incident, he will frequently retrieve the weapon used and store it where it would be readily accessible for defense or offense, such as in his residence, on his person or in a vehicle to which he has access.

5

1    (DSUF, No. 51)

2         iii. **Facts Regarding Detective Yee's Request for a**

3              **Search Warrant**

4         It is undisputed that the ten residences were listed and

5    described with particularity in Attachment "A" to the Search

6    Warrant Affidavit.  (DSUF, No. 58)  The items to be seized

7    included evidence of gang membership, firearms and ammunition,

8    and were listed in Attachment "B" to the Search Warrant

9    Affidavit.  (DSUF, No. 59)  Detective Yee had probable cause to

10   believe, and did believe, that the property described in

11   Attachment "B" to the Affidavit was lawfully seizable pursuant to

12   California Penal Code Section 1524.  (DSUF, No. 60)

13        It is also undisputed that on or about February 17, 2004,

14   Detective Yee took the Search Warrant Affidavit and Confidential

15   Attachment to the Honorable Judge Franklin P. Jones' chambers in

16   the Fresno County Superior Court.  (DSUF, No. 63)  Detective Yee

17   believed that Judge Jones was a detached and neutral magistrate

18   at the time he presented the Search Warrant Affidavit to him.

19   (DSUF, No. 64) Freeman does not dispute that Judge Jones signed

20   the Search Warrant after thorough review on February 17, 2004 and

21   authorized the search of the ten residences.  (DSUF, No. 69)

22   Judge Jones ordered the confidential portion of the Affidavit to

23   be sealed, which was kept in the custody of the Fresno County

24   Superior Court.  (DSUF, No. 70)

25        iv.  **Judge Jones Reliance on Detective Yee's Training**

26             **and Experience**

27        Defendants argue that Detective Yee described in detail his

28   professional experience, his experience with street gangs, his

assignments, and his duties and training with the Fresno Police

Department.   It is undisputed that Detective Yee had extensive

training and experience, which included the following:

    1.    Identification and validation of gangs and gang
            members

    2.    The investigation of gang-related shootings,
            homicides and other violent gang crimes leading to
            the arrests and the conviction of numerous violent
            gang offenders and the recovery of narcotic
            paraphernalia, controlled substances and/or stolen
            property

    3.    Gathering of gang intelligence information; the
            maintenance of gang files/information shared with
            detectives from other local law enforcement
            agencies, other departments in the State of
            California and other states across the nation

    4.    He has received ongoing advanced officer training
            courses on the preparation and service of search
            warrants

    5.    Cultural awareness, use of force, informant
            development

    6.    Interview and interrogation and various other
            classes and seminars.

(DSUF, No. 71)

It is also undisputed that in his assignment with

M.A.G.E.C., Detective Yee had become acquainted with numerous

gang members and associates through investigations, arrests,

field interviews, vehicle stops, subject checks, consensual

contacts and informants.   (DSUF, No. 72)   Detective Yee is

familiar with street gang habits, mannerisms, and techniques used

in committing violent offenses and gang members' behaviors in

attempting to conceal evidence of such occurrences from detection

by both the general public and law enforcement.   (DSUF, No. 73)

At the time of preparing this Search Warrant Detective Yee had

been specializing in Black gangs and investigating gang-related

7

1    shootings, homicides, and other violent gang crimes for six

2    years.  (DSUF, No. 74)  Detective Yee has also taught Black Gang

3    Awareness Training Seminars in Fresno County and conducted gang

4    presentations to numerous civic groups.  (DSUF, No. 75)

5         Freeman does not dispute that Detective Yee participated in

6    numerous parole/probation searches of residences of known,

7    validated criminal street gang members/associates where gang

8    paraphernalia was located.  (DSUF, No. 76)  He was a member of

9    the California Gang Investigator's Association, Northern

10   California Gang Investigator's Association, California Homicide

11   Investigator's Association, and California Narcotics Officer's

12   Association.  (DSUF, No. 77)

13        Detective Yee received some of this training through his

14   department agency while serving on the M.A.G.E.C.[3] team.  (DSUF,

15   No. 78)  Most of the named suspects included in Detective Yee's

16   Affidavit, were validated gang members or associates.  (DSUF, No.

17   82)  Detective Yee has qualified and testified as an expert on

18   Black gangs in the California Superior Court and Federal Court.

19   (DSUF, No. 83)  It is his expert opinion that it is common for

20   girlfriends and parents to aid and abet their boyfriend or child

21

22   _____

23        [3]  Freeman does not dispute that M.A.G.E.C.'s mission is to
     eradicate criminal activity of street gangs whose members
24   threaten, terrorize, and commit a multitude of crimes against the
     peaceful citizens of their neighborhoods, schools and businesses.
25   (DSUF, No. 79)  M.A.G.E.C. utilizes the California State Office
     of Criminal Justice 10-point criteria to validate gang members
26   and associates.  (DSUF, No. 80)  Three or more of the ten points
     can validate the subject as an active gang member.  Two of the
27   ten points can validate the subject as an associate of the gang.
     (DSUF, No. 81)
28

1  who are known criminals by hiding, concealing and disposing of
2  any type of evidence that might contribute to their prosecution.
3  (DSUF, No. 84)

4              **v.    Facts Relating to Freeman's Residence and Its**
5                   **Proximity to Gang Activity**

6         Defendants state that Freeman's residence is situated in a
7  lower economic neighborhood that is well known for criminal gang
8  activity and violence.  (DSUF, No. 85)  It is undisputed that
9  Freeman's home is located in the heart of where most of the gang-
10 related shootings occurred.  (DSUF, No. 86)

11        On January 22, 2004, Darryl Hilliard was under surveillance
12 by law enforcement officers, including Detective Yee.  (DSUF, No.
13 89)  It is undisputed that as of January 22, 2004 a green 2003
14 Pontiac Grand Am was parked in Freeman's driveway and that a
15 records check confirmed this vehicle was registered to her.
16 (DSUF, No. 92)  It is also undisputed that Hilliard's mother
17 dropped off Hilliard at Freeman's residence, and then drove away
18 without him.  (DSUF, No. 93)

19        Freeman also does not dispute that later that same day,
20 after a court appearance at the Fresno County Courthouse,
21 Hilliard was observed getting into Freeman's Pontiac Grand Am.
22 (DSUF, No. 95)  It is undisputed that on the way to Hilliard's
23 mother's house, located at 4430 N. Sequoia Avenue in Fresno, Ms.
24 Dillingham was observed driving at high speeds and making quick
25 turning movements as Hilliard leaned down in the front passenger
26 seat as if to conceal himself.  (DSUF, No. 97)  This behavior was
27 consistent with counter-surveillance techniques.  (DSUF, No. 98)
28        Surveillance of Hilliard continued on February 2, 2004.

                                  **9**

1   (DSUF, No. 99)   After taking him to court, Ms. Dillingham drove

2   Hilliard back to his mother's house.   (DSUF, No. 101)   Shortly

3   thereafter, Hilliard was observed driving Freeman's vehicle to

4   various locations where he made contact with various other

5   Strother Boys gang affiliates.   (DSUF, No. 105)   Hilliard's

6   behavior while driving around in Plaintiff's vehicle was

7   consistent with that of a person dealing drugs. (DSUF, No. 106)

8   Freeman also does not dispute that due to the lack of resources

9   and manpower amongst law enforcement, it was not feasible to

10  monitor every move Darryl Hilliard made.   (DSUF, No. 108)

11      It is common practice for gang members to keep their

12  weaponry, stolen property and other evidence of their crime

13  involvement at their homes or "safe houses".   (DSUF, No. 109)   It

14  is undisputed that, in an attempt to evade detection by the

15  police, gang members will routinely move the property among

16  associates/members/girlfriends within their own specific gang.

17  (DSUF, No. 110)   Detective Yee was looking for ballistic evidence

18  that would tie Darryl Hilliard to some of the crimes he was a

19  prime suspect in, i.e. drive by shootings, shooting into homes,

20  shooting into cars, and shooting people.   (DSUF, No. 111)

21      Freeman's primary physician testified that she currently has

22  stress as a result of her granddaughter living with her.   (DSUF,

23  No. 244)   Freeman does not dispute that her home had been shot at

24  while she was in her living room causing bullet hole damage to

25  her house before this incident.   (DSUF, No. 245)   Further,

26  Freeman's neighbor across the street was almost shot when her

27  home was hit with gunfire. [Anthony Lyday testified that while

28  his mother was cooking at the stove in her kitchen, Anthony heard

10

gun fire so he grabbed his mother and threw her to the ground. Immediately thereafter, bullets came through her kitchen where she was standing. There have been a couple of these incidents where he has had to save his mom.]  (DSUF, No. 247)

B.   Facts Relevant to the Service of the Search Warrant

    1.   The Search Warrant Briefing

    On the morning of February 19, 2004[4], all officers who were to participate in serving the Search Warrant, met at the M.A.G.E.C. headquarters for a briefing before the search.  (DSUF, No. 114)  Detective Mark Yee was assigned to the Metro Investigations Team, which was to serve the Warrant at four locations, none of which are a subject of this lawsuit.  (DSUF, No. 115)

    The Rural Tactical Team is a uniform team focused primarily on the tactical operation of eradicating criminal activity within the rural County of Fresno.  (DSUF, No. 116)  Members of this team consisted primarily of Fresno County Sheriff Deputies, who included: Defendants Ian Barrimond, John Capriola, Jason Hollins, Robert Perez, and Andrew Simonson; as well as Fresno Police Officer Robert Garrison.  (*Id.*)  It also included non-defendant Officers Andrew Camerana and Michael Higgins.  This team was assigned to search two homes.  (*Id.*)

    During the briefing, Detective Yee provided all the officers with the following:

_____

    [4] It is undisputed that February 19, 2004 was a clear, bright, and sunny day.   (DSUF, No. 113)

1       1.     a background of his investigations

2       2.     a history of the ongoing gang-related shootings

3       3.     the nature of the Search Warrant and information

4                regarding suspect Darryl Hilliard

5       4.     a photograph of Darryl Hilliard

6       5.     the locations to be searched

7       6.     copies of the list of items authorized to be

8                searched for and seized

9       7.     and a copy of the Notice of Search Warrant that

10              each team was to serve on the occupants of the

11              residences

12

13 (DSUF, No. 117)  Specifically, Detective Yee cautioned the

14 officers that they were serving a "high risk" Search Warrant and

15 to expect for Darryl Hilliard or his fellow gang members and/or

16 associates, to be at any of the locations.  He also cautioned

17 that it was very likely that such individuals would be armed.

18 (DSUF, No. 118)

19      Sergeant Barrimond had assigned Fresno Police Officer Robert

20 Garrison to be the Case Agent for their team, whose

21 responsibilities included: giving the knock and notice,

22 collecting and documenting all the evidence and property seized,

23 preparing the report, and booking the evidence into the Fresno

24 Police Department ("FPD") property room.  (DSUF, No. 119)

25 Sergeant Barrimond chose Officer Garrison because he was the only

26 Fresno Police Officer on the team and since the Case Agent for

27 the entire operation was Detective Yee, a Fresno Police Officer,

28 it would make the processing, documentation and booking of

1  evidence easier to have a Fresno Police Officer act as Case
2  Agent.  (DSUF, No. 120)

3       After the briefing, Officer Garrison contacted the FPD
4  Records Department by telephone and spoke with a Records' Clerk
5  who informed him that there had been several prior calls for
6  service at Plaintiff's residence, which included prior
7  disturbances and prior warrant service attempts.  (DSUF, No. 121)

8       The Rural Tactical Team then proceeded to the Chandler
9  Airport, a neutral location near the Plaintiff's residence, to
10  conduct a second briefing.  At this location, the officers
11  checked their equipment, ammunition, and gear to ensure
12  everything was properly functional.  Each officer was in full law
13  enforcement tactical gear wearing bullet proof vests that bore
14  the name, M.A.G.E.C. on the back.  Each of their uniforms were
15  clearly marked with their respective law enforcement agency
16  insignia or patch.  (DSUF, No. 122)

17       Sergeant Barrimond gave the officers position assignments
18  and assigned Deputies Perez and Simonson to the perimeter of the
19  residence.  (DSUF, No. 123)  Officers Garrison, Camerana and
20  Higgins, and Deputies Capriola and Hollins, were all assigned to
21  the Entry Team.  (DSUF, No. 124)  Due to the variety of risks
22  involved in serving this Search Warrant, Sergeant Barrimond
23  ensured that all the officers were mentally prepared and asked
24  them, "are you all here?".  (DSUF, No. 125)  He wanted to make
25  sure they were focused and did not have their minds on extraneous
26  matters.  (*Id.*)

27       Defendants Barrimond, Capriola, Hollins, Perez, Simonson and
28  Garrison, were of the understanding that they were going to

search Plaintiff's residence pursuant to a valid search warrant signed by a judge and had no reason to believe the Search Warrant was unlawful or invalid in any respect.  (DSUF, No. 157)

### 2.   Search of Freeman's Residence

All the officers who participated in the service of this Search Warrant understood that this was a "high risk" warrant due to the nature of the underlying crimes being committed by the suspect Darryl Hilliard that included homicide, gang-related shootings, and other criminal activity.  (DSUF, No. 221)  All the officers understood Hilliard was a validated gang member whose fellow gang members, associates and affiliates were also very dangerous.  (DSUF, No. 222)  Freeman does not dispute that the officers also understood they were searching for firearms, ammunition, gang indicia and other evidence of criminal activity. (DSUF, No. 223)

While approaching the front of the house, Deputies Perez and Simonson branched out of the line to take a position near the driveway, perimeter area.  (DSUF, No. 126)  The lead Officer was Garrison who was followed by Officer Higgins who was then followed by Deputy Capriola.  (DSUF, No. 127)

Plaintiff's front door is on a two step elevation from the ground.  The house has barred windows on each side of the front door.  (DSUF, No. 128)  Officer Garrison did not stand in front of the door but positioned himself directly under the right front window on the ground level.  (DSUF, No. 130)  Officer Garrison had his department issued handgun in his right hand, and used his left hand to bang on the security door.  (DSUF, No. 131)  He checked and confirmed the security door was locked.  (DSUF, No.

**14**

133)

Plaintiff, who was inside the residence, did not immediately open the door and the Officers on the "stick" (line-up of officers on the entry team going through the door) were growing concerned that the team was taking too long to make entry.  After a lengthy period of time, the interior door finally opened. (DSUF, No. 134)  Plaintiff, responded, "what do you want?" (DSUF, No. 136)  Officer Garrison continued to tell Plaintiff to open the door.  (DSUF, No. 137)  Plaintiff finally unlocked the security door at which point Officer Garrison grabbed the door handle and pulled the door open.  (DSUF, No. 138)  Officer Garrison stepped onto the front step and made entry into the home, he was telling Plaintiff to get down on the floor.  (DSUF, No. 139)  Plaintiff was verbally abusive to Officer Garrison as well as the Paramedics who arrived on scene.  (DSUF, No. 243)

It is undisputed that Detective Yee did not participate in serving the Search Warrant at Plaintiff's residence and was never present at any time during the search of her residence.  (DSUF, No. 112)  Two of Plaintiff's neighbors who were positioned across the street and witnessed the entry, testified in deposition that they could hear the officers shouting for Plaintiff to open the door for several minutes.  (DSUF, No. 217)  Specifically, Anthony Lyday estimated that it took two to three minutes before the officers made entry.  (DSUF, No. 218)  Gwen Echoles and Anthony Lyday both heard the officers shout and announce their presence while pounding on the front metal security door of Plaintiff's residence.  (DSUF, No. 219)  Neither Gwen Echoles or Anthony Lyday heard the officers ever threaten to shoot Plaintiff.

15

1   (DSUF, No. 220)  During the search, Officer Garrison seized a

2   loaded six shot revolver that was located in the bedroom.  (DSUF,

3   No. 226)

4        3.   <u>Officer Garrison's Use of Force</u>

5        Officer Garrison has been with the Fresno Police Department

6   since 1996 and was assigned to the M.A.G.E.C. Unit in 2003.

7   (DSUF, No. 237)  Officer Garrison immediately entered the

8   residence but was not able to clearly see inside due to a brief

9   eye adjustment caused by coming in from outside where it was

10  bright and sunny, into a small, dimly lit room.  (DSUF, No. 140)

11  Deputy Capriola also saw that it was very dark and he could not

12  see much inside the residence.  (DSUF, No. 141)  Officer Garrison

13  felt his foot brush against an object on the floor then saw a

14  form in front of him.  He yelled, "Police Department, get on the

15  ground, get on the ground."  (DSUF, No. 142)

16       There was no cover or concealment for any of the officers

17  who were in that doorway.  (DSUF, No. 146)  Deputy Garrison

18  immediately thought, "this isn't good" because the officers were

19  not entering as fast as they should have.  (DSUF, No. 147)

20       The doorway is known as the "funnel of death".  This is due

21  to the high likelihood of officers being injured or killed in the

22  doorway because of the backlighting.  Therefore it is necessary

23  to get through the doorway as quickly and safely as possible.

24  This ensures the safety of the officers and the subjects of the

25  residence.  (DSUF, No. 148)

26       Given the amount of time between Officer Garrison entering

27  the residence, feeling this perceived threat to his gun arm,

28  combined with his inability to see clearly, and his men directly

behind him moving quickly, he did not have sufficient time to evaluate the age and characteristics of this individual.  (DSUF, No. 150)  Ordinarily, an entry would be very rapid, and although the momentum of the officers on this team was originally quick, the entry was much slower due Officer Garrison's encounter with Plaintiff.  (DSUF, No. 153)

After the home was secured, Officer Garrison returned to the living room area, which was the first time he realized Plaintiff was an elderly female.  (DSUF, No. 154)  Officer Garrison inquired as to whether Plaintiff was okay and offered to call her an ambulance, but she refused. (DSUF, No. 155)

He asked her for her name, but she was uncooperative and verbally abusive towards him.  Officer Garrison did not want to aggravate the tension Plaintiff  was already exhibiting, so, he limited his contact with her.  (DSUF, No. 156)  Officer Garrison as well as all the officers on this team deny that Officer Garrison ever threatened to shoot Plaintiff.  (DSUF, No. 216)

    4.  <u>Deputy Perez</u>

Deputy Perez remained outside of the residence securing the perimeter where he remained throughout the entire duration of the search.  (DSUF, No. 159)  Deputy Perez looked for threats and/or suspects who may have tried to flee the area.  (DSUF, No. 160) At no time during the duration of the search did Deputy Perez ever enter Plaintiff's residence.  (DSUF, No. 161)  At no time during the search did Deputy Perez ever make any contact, physical or verbal, with the Plaintiff.  (DSUF, No. 162)

    5.  <u>Deputy Simonson</u>

Deputy Simonson remained outside of the residence securing

17

1  the perimeter until the entry team was done securing the interior
2  of the residence.  (DSUF, No. 163)  Deputy Simonson then went
3  inside the residence to assist in documenting evidence seized on
4  an inventory log.  (DSUF, No. 164)  At no time while inside the
5  residence did Deputy Simonson ever make any physical or verbal
6  contact with the Plaintiff.  (DSUF, No. 165)  He was not present
7  during the initial entry and did not observe the physical contact
8  between Plaintiff and Officer Garrison.  (DSUF, No. 166)

9        6.  <u>Deputy Capriola</u>

10       Deputy Capriola was the third officer who entered
11  Plaintiff's residence, behind Officer Higgins, who was behind
12  Officer Garrison.  (DSUF, No. 167)  Usually, the entry into a
13  residence is very rapid, however, on this particular day, it was
14  slower.  (DSUF, No. 168)  Deputy Capriola's immediate thought
15  was, "this isn't good...this is going too slow" because the
16  officers were not entering into the house as fast they should
17  have.  (DSUF, No. 169)

18       Deputy Capriola looked beyond the physical contact into the
19  dark living room and beyond Officer Garrison to see if there were
20  any other threats ahead.  (DSUF, No. 172)  Deputy Capriola was
21  very concerned because Officer Garrison got hung up just inside
22  the doorway, causing Officer Higgins to stall in the door frame,
23  thereby causing Deputy Capriola to stall just outside the
24  doorway.  (DSUF, No. 173)  In this position, there was no cover
25  or concealment for any of the officers who were in that doorway.
26  (DSUF, No. 174)

27       Once inside the door, Deputy Capriola observed Plaintiff
28  laying partially on the ground and halfway on a chair that was

                                18

situated a foot or two on the right, inside the door.  (DSUF, No.
175)  Plaintiff's legs were sticking out partially in the doorway
but Deputy Capriola did not see how it was she landed in that
position.  (DSUF, No. 176)  Deputy Capriola stepped over
Plaintiff's feet and went left into the kitchen to secure that
area.  (DSUF, No. 177)  After the house was determined to be
secured, he walked over to the Plaintiff and assisted Sergeant
Barrimond in helping Plaintiff to a couch. (DSUF, No. 178)
Deputy Capriola had no further contact or communication with
Plaintiff.  (DSUF, No. 179)

### 7.   Deputy Hollins

Deputy Hollins was one of the last officers to enter
Plaintiff's residence because he was assigned to the breaching
device that is used to force entry when necessary.  (DSUF, No.
180)  The breaching device requires two hands to carry so he did
not have a firearm in hand.  (DSUF, No. 181)  The knock and
notice took much longer than any other search warrant he had ever
been on.  (DSUF, No. 182)  Deputy Hollins, who stands six feet,
four inches tall, was able to see over the officers in front of
him.  (DSUF, No. 183)

As the officer made their way into the residence, Deputy
Hollins caught a glimpse of Plaintiff falling near a chair that
was by the front door.  (DSUF, No. 184)  Deputy Hollins did not
see how she fell or what caused her to fall.  (DSUF, No. 185)

After securing the residence but prior to conducting the
search, Deputy Hollins photographed the residence.  He also
photographed the items and locations from where they were seized.
(DSUF, No. 186)  He had no physical or verbal contact with the

1  Plaintiff the entire duration of the search.  (DSUF, No. 187)

2      8.  <u>Sergeant Barrimond</u>

3      Sergeant Barrimond was the supervisor for the Rural Tactical

4  Team.  (DSUF, No. 188)  Sergeant Barrimond's responsibilities as

5  Supervisor were to make the assignments and to ensure that his

6  team executed the search warrant in a lawful, efficient and safe

7  manner.  (DSUF, No. 189)  Prior to embarking to the Plaintiff's

8  residence, Sergeant Barrimond obtained, reviewed and familiarized

9  himself with a copy of the entire Search Warrant Affidavit and

10  attachments because he wanted to be comfortable with it since his

11  team did not write the Search Warrant.  (DSUF, No. 190)

12      When the team arrived to Plaintiff's residence, Sergeant

13  Barrimond got in position about the fourth or fifth officer in

14  the entry stick.  (DSUF, No. 191)  Officer Garrison continued to

15  knock without anyone from within the residence opening the door.

16  (DSUF, No. 193)  The team waited a long enough period of time

17  before receiving a response from within the residence, that

18  Sergeant Barrimond almost ordered the team to force entry by

19  using the breaching device.  (DSUF, No. 194)

20      During the knocking he heard a voice from within the home.

21  Finally the occupant of the home unlocked the door at which point

22  Sergeant Barrimond gave the  command, "let's go".  (DSUF, No.

23  195)  Sergeant Barrimond was concerned about the officers being

24  in the "funnel of death" because they did not know whether there

25  was anyone within the residence who had weapons.  (DSUF, No. 196)

26  The officers had a disadvantage because the sunlight was behind

27  them, so they were backlit and the interior of Plaintiff's

28  residence was somewhat dark. (DSUF, No. 197)

20

1   After making entry, Sergeant Barrimond'S eyes had to
2   acclimate to the dimness of the house.  (DSUF, No. 198)  After
3   the residence was secured, Sergeant Barrimond focused his
4   attention on Plaintiff who was leaning on a chair, and the
5   children who were on the couch in the living room.  (DSUF, No.
6   199)

7   Sergeant Barrimond helped Plaintiff get seated on a chair
8   and explained to her why the officers were there and the purpose
9   of their search.  (DSUF, No. 200)  He advised her that the
10  officers were looking for guns and gang-related items pursuant to
11  a search warrant.  (DSUF, No. 201)  Sergeant Barrimond then began
12  talking to the children and tried to calm them down by making
13  funny faces and small talk to try and make them comfortable.
14  (DSUF, No. 202)  He asked Plaintiff if the kids needed to be
15  changed, fed or taken care of in any way.   (DSUF, No. 203)

16  Officer Garrison explained to Sergeant Barrimond that when
17  he went in through the door, someone grabbed for his gun arm, so
18  he pushed them away.  (DSUF, No. 204)  Sergeant Barrimond
19  understood that in the heat of the moment, the normal reflex for
20  a person who is concerned for the safety of children in her
21  residence, is to challenge a person coming into the residence
22  with a gun, which would include grabbing at that person.  (DSUF,
23  No. 205)

24  Officers have discretion as to how to evaluate a tactical
25  situation.  Plaintiff was not arrested or cited for her offense,
26  nor was she ever patted down, searched, placed in handcuffs or
27  restrained in any other way.  In fact, she was allowed to use the
28  telephone to receive and make phone calls.  (DSUF, No. 206)

21

1       Sergeant Barrimond asked Plaintiff if she was okay and

2   whether or not she would like an ambulance called.  (DSUF, No.

3   195)  Plaintiff complained of hip pain but refused the offer to

4   have an ambulance called. (DSUF, No. 207)  Nevertheless, Sergeant

5   Barrimond directed Officer Garrison to call an ambulance because

6   he wanted to make sure she was okay.  When the paramedics

7   arrived, Plaintiff refused treatment by them. (DSUF, No. 208)

8       After the search, Sergeant Barrimond ensured that all his

9   officers had their equipment and materials before leaving

10  Plaintiff's residence.  (DSUF, No. 209)  At some point after the

11  search, Sergeant Barrimond contacted Detective Yee to advise him

12  that suspect Darryl Hilliard was not at Plaintiff's location.

13  (DSUF, No. 211)  Detective Yee responded that Darryl Hilliard was

14  apprehended at another location and was in custody.  (DSUF, No.

15  212)

16      9.   <u>Oversight and Training of Fresno Police Officers</u>

17      Officer Yee and Garrison are obligated to comply with the

18  ongoing training requirements of the Department.  (DSUF, No. 228)

19  C.   <u>Disputed Facts</u>

20      1.   <u>Facts Relevant to Obtaining the Search Warrant</u>

21      Freeman disputes the fact that Detective Yee received

22  credible information from reliable sources, including

23  confidential informants, and continued to monitor the information

24  provided to him from those informants.  (DSUF, No. 4).  Freeman

25  also disputes that the twenty-four page statement of probable

26  cause in support of the Search Warrant accurately described the

27  one and a half year investigation arising out of the gang related

28  shootings in Fresno and other criminal acts committed by members

1  of the West Side Strother Boys and Garrett Street gangs.  (DSUF,
2  No. 6)

3      Freeman argues that Detective Yee's affidavit lacked
4  adequate foundation for the reliability of any of the
5  confidential and/or anonymous sources.  (PSDF, No. 1)  Freeman
6  also argues that Detective Yee lacked personal corroboration
7  information regarding the confidential/anonymous sources which
8  had been deemed "reliable by Officers other than Detective Yee.

9          i.    Detective Yee's Use of Confidential Informants and
10                Witnesses in His Affidavit

11      Detective Yee failed to do anything to personally assess the
12  credibility of Confidential Informant #1.  (PSDF, No. 3)  Freeman
13  also argues that Detective Yee did not affirmatively establish
14  the following:

15  1.    whether both officers Eddy and Cardinelli[5] utilized
16        Confidential Informant #1.  (PSDF, No. 4)

17  2.    whether said officers vouched for the reliability of
18        Confidential Informant #1.  (PSDF, No. 5)

19  3.    the particular factors upon which said Officers based their
20        opinions as to the reliability of Confidential Informant #1.
21        (PSDF, No. 6)

22      Freeman also argues that during his deposition, Detective
23  Yee could not remember who the witnesses were who he listed on
24  page 13 of his affidavit.  (PSDF, No. 7)  Yee did not author
25  reports concerning the page 13 witnesses and could not

26

27  ───────────────
        [5] Officers Eddie and Cardinelli are not parties to this
28  dispute.

                            23

1  affirmatively establish the existence of written reports.  (PSDF,
2  No. 8)   Yee also never spoke to the page 13 witnesses or
3  determined the reliability of page 13 witnesses.  (PSDF, No. 9 –
4  10)

5       Detective Yee did not speak to any of the witness listed on
6  page 15, lines 3-11, of his Affidavit.  (PSDF, No. 11)   Further,
7  Detective Yee determined the reliability of the anonymous caller
8  on page 15 of his affidavit by traveling to the Cooley Plaza
9  Apartments and determining that Antoinette Hilliard's vehicle was
10 parked at said location.  (PSDF, No. 12)

11      Detective Yee did not write a report concerning said page 15
12 anonymous caller.  (PSDF, No. 13)   Detective Yee did not know the
13 identity of the page 15 anonymous caller.  (PSDF, No. 14)
14 Detective Yee did not take any steps to independently corroborate
15 the trustworthiness of the witness listed in his search warrant
16 affidavit at page 15.  (PSDF, No. 15)

17      Detective Yee's search warrant affidavit at page 16, relies
18 upon an anonymous source, who Detective Yee did not speak to, nor
19 did he write a report concerning this anonymous source's
20 information. (PSDF, No. 19)   Detective Yee did not corroborate
21 the accuracy of the page 16 anonymous source's information.
22 (PSDF, No. 20)

23      Detective Yee did not know the identity of the confidential
24 informant #2 listed on page 16, line 330 of his affidavit. (PSDF,
25 No. 21)   Detective Yee did not "handle" Confidential Informant
26 #2.  (PSDF, No. 22)   Detective Yee did not know which officer
27 handled Confidential Informant #2.  (PSDF, No. 23)   Detective Yee
28 did not know who determined that confidential informant #2 was

1  trustworthy.   (PSDF, No. 24)   Detective Yee surmised that since

2  the information turned out to be true that confidential informant

3  #2 would be deemed trustworthy.   (PSDF, No. 25)

4       Detective Yee knew the identity of the confidential

5  informant #3 listed on page 17 line 357 of his affidavit. (PSDF,

6  No. 26)   Detective Yee did not handle confidential informant #3,

7  prior to authorizing the search warrant affidavit. (PSDF, No. 27)

8  Detective Yee determined that confidential informant #3's

9  trustworthiness and reliability were established based upon what

10 other detectives told him. (PSDF, No. 28)   Detective Yee did not

11 know "specifically" how confidential informant #3 was deemed

12 reliable by those other officers.   (PSDF, No. 29)   Detective Yee

13 indicated that confidential informant #3 had not been paid for

14 any information contained in the search warrant affidavit. (PSDF,

15 No. 30)

16      Detective Yee indicated that confidential informant #3 had

17 been paid in the past by other detectives.   (PSDF, No. 31)

18 Detective Yee stated that the services of confidential informants

19 were utilized in coming to the conclusion that Darryl Hilliard

20 had committed assault with a deadly weapon. (PSDF, No. 34)

21      Detective Yee indicates that the reliability of the

22 informants is contained within the "sealed" Hobbs portion of the

23 search warrant affidavit. (PSDF, No. 35)   Detective Yee did not

24 include his allegation that D. Hilliard went into Freeman's

25 house, within his search warrant affidavit. (PSDF, No. 36)

26           ii.   Monique Thomas

27      Detective Yee admitted that he did not take Monique Thomas's

28 complaint and that he knew that Detective Andreas and Torres were

                                25

1  unable to corroborate her information.  (PSDF, No. 16 and No. 53)
2  Detective Yee knew that there were inconsistencies in Monique
3  Thomas' statements and further knew that Detective Andrews' and
4  Torres' were unable to corroborate her information.  (PSDF, No.
5  17)

6      Detective Yee knew that Mr. Green, another potential victim
7  in the alleged attempted shooting of Monique Thomas, gave a
8  different account of said alleged shooting, inconsistent with Ms.
9  Thomas's account.  (PSDF, No. 18)

10     2.   Detective Yee's Investigation

11          i.   History of the Investigation

12     Freeman does not dispute most of the facts in the record
13  regarding the extensive incidents of violence between Strother
14  Boys and Garret Street gangs.  However Freeman disputes
15  Defendants contention that on February 13, 2003 Monique Thomas
16  ("Thomas"), the girlfriend of Garrett Street gang member Monette
17  Solomon, was allegedly shot near Martin Luther King Jr. Boulevard
18  and Florence Avenues.  (DSUF, No. 18)  Freeman disputes the fact
19  that Thomas was the passenger in a vehicle driven by Robin Green
20  when they were shot at by Strother Boys gang members Daniel Pena
21  and Darryl Hilliard.  (*Id.*)  Freeman also disputes that Thomas
22  related that Pena leaned out of the passenger's side of
23  Hilliard's light blue Ford Mustang that had pulled alongside of
24  her, that Pena started shooting at them with an assault-type
25  rifle, striking the vehicle in which she was traveling in, and
26  that Thomas recognized Pena and Hilliard on sight.  (*Id.*)
27  ///
28  ///

26

1          ii.   Detective Yee's Conclusions of the Investigation -

2                Confidential Facts

3       Freeman disputes that Detective Yee's Affidavit was also

4  supported by a "Confidential Attachment" which set forth

5  additional information he considered in making his determination

6  that there was probable cause to request the issuance of the

7  Search Warrant.  (DSUF, No. 52)  Freeman also disputes that the

8  information within the "Confidential Attachment" was provided to

9  Detective Yee by confidential informant(s) and could not be

10  included in the Affidavit.  (DSUF, No. 53)

11      Detective Yee confirmed that Darryl Hilliard was only

12  charged for Health and Safety Code 11351.5, Possession of

13  Marijuana for Sale, and committing a crime while out on bail.

14  (PSDF, No. 32)  According to Freeman, Detective Yee stated there

15  was no probable cause to believe Darryl Hilliard had committed

16  murder, attempted murder, or conspiracy to commit murder.  (PSDF,

17  No. 33.)

18          iii.  Facts Regarding Detective Yee's Request for a

19                Search Warrant

20      Freeman disputes the following facts set forth in

21  Defendants' statement of undisputed facts:

22      1.   That Detective Yee requested a search warrant for
            ten (10) residences in Fresno County of suspects
23           or affiliates who, based upon his investigation,
            he believed were in possession of  weapons and
24           gang indicia that had been used in the gang
            related shootings he was investigating.  (DSUF,
25           No. 56)

26      2.   that surveillance conducted of Darryl Hilliard,
            determined an association between him and these
27           ten residences.  (DSUF, No. 57)  that Yee also
            believed there was a strong possibility that said
28           property was located at the locations set forth in

                                   27

1          Attachment "A" to the Affidavit.  (DSUF, No. 61)

2     3.    that the Search Warrant was considered a "high
            risk" Search Warrant because it involved the
3           search for numerous weapons, mostly firearms and
            gang indicia, suspected to have been used in
4           numerous gang-related shootings between rival
            criminal street gangs; and which were believed to
5           be located at those residences associated with
            gang members.  (DSUF, No. 62)

6
      4.    that all of the information Detective Yee
7           presented to Judge Jones was accurate and truthful
            and at no time did he mislead or make any
8           misrepresentations to him.  (DSUF, No. 65)

9     5.    that Detective Yee had a good faith belief that
            there was sufficient probable cause to justify the
10          issuance of the Search Warrant for the search of
            the ten residences.  (DSUF, NO. 66)
11
      6.    that Yee also had a good faith belief that the
12          warrant was not overbroad.

13    7.    that Detective Yee had no reason to believe that
            the warrant was unlawful or otherwise invalid in
14          any respect and signed it under penalty of
            perjury.  (DSUF, NO. 67)
15
      8.    that Detective Yee disclosed to Judge Jones
16          information pertaining to the reliability of the
            confidential informant(s).  (DSUF, NO. 68)
17
           iv.   Disputed Facts Relating to Freeman's Residence and
18
                 It's Proximity to Gang Activity
19
          Freeman disputes Defendants contention that her
20
     granddaughter, Shatera Dillingham, had lived with her for a
21
     significant period of time before the search.  (DSUF, No. 87)
22
     Freeman also disputes that Ms. Dillingham was the girlfriend of
23
     suspect, Darryl Hilliard and the mother of his child; and
24
     Plaintiff provided care and babysitting for Darryl Hilliard's
25
     child on a daily basis.  It is also disputed that on the day of
26
     the search, Ms. Dillingham drove by her grandmother's home, saw
27
     law enforcement officers there, but did not stop, instead, kept
28
                                 28

1    driving because she got nervous.   (DSUF, No. 88)

2         Freeman further disputes the following:

3         1.    Shatera Dillingham was observed with Darryl
               Hilliard more than half the time he was under
4               surveillance.   (DSUF, No. 90)

5         2.    During this surveillance, Hilliard was observed
               being dropped off at the Plaintiff's residence by
6               his mother, and seen walking to her front door.
               (DSUF, No. 91)
7
          3.    Detectives no longer saw Hilliard and determined
8               he went inside Plaintiff's residence.   (DSUF, No.
               94)
9
          4.    His girlfriend, Shatera Dillingham, was driving
10              Plaintiff's vehicle.   (DSUF, No. 96)

11        5.    Hilliard exited his mother's residence and got
               into Plaintiff's vehicle with his girlfriend,
12              Shatera Dillingham, driving.   (DSUF, No. 100)

13        6.    Darryl Hillard later left his mother's residence
               as a passenger in Plaintiff's car.   (DSUF, No.
14              102)

15        7.    Later that same day, Hilliard was driven in
               Plaintiff's car to a residence on Tuolomne street.
16              (DSUF, No. 103)

17        8.    On February 2, 2004 at approximately 4:28 p.m.,
               Hilliard was driven to the Plaintiff's residence,
18              where he exited the vehicle and walked inside the
               house and remained there briefly.   (DSUF, No. 104)
19
          9.    Detective Yee determined that it was likely that
20              Darryl Hilliard possessed weapons used in the
               rival gang shootings and other criminal indicia.
21              Hilliard could have circulated them among his
               fellow gang members including his girlfriend,
22              Shatera Dillingham.   (DSUF, No. 107)

23        10.   Plaintiff's home had been searched on at least
               three occasions prior to this incident.   (DSUF,
24              No. 246)

25        According to Freeman, Shatera Dillingham was no longer the

26   girlfriend of Darryl Hilliard on February 2, 2004. (PSDF, No. 54)

27   ///

28   ///

1

      **3.**    <u>Facts Relevant to the Service of the Search Warrant</u>

2

      **i.**    <u>Search of Freeman's Residence</u>

3

Freeman disputes the following facts:

4
5

    **1.**    The officers were unable to see through the locked security door and could not tell whether or not the interior door was opened.  (DSUF, No. 129)

6
7
8

    **2.**    Officer Garrison knocked loudly on the door and shouted words similar to, "Police Department, Search Warrant, Open the door!" several times. (DSUF, No. 132)

9

    **3.**    Again, Officer Garrison shouted, "Police Department, Search Warrant, Open the door!" (DSUF, No. 135)

10
11

    **4.**    Defendants served the Search Warrant lawfully, professionally and ethically.  (DSUF, No. 158)

12
13
14

    **5.**    All the officers understood that Darryl Hilliard or any of his fellow gang members or affiliates could be at Plaintiff's residence and possibly armed.  (DSUF, No. 224)

15
16
17
18
19
20

    **6.**    Given the totality of the available information, including two independent civilian witnesses, Defendants' Police Practices Expert, Joseph Callanan agrees that these officers complied with standard police procedures in their approach to the Plaintiff's residence and in their verbal announcements attempting to identify themselves, establish the reason for their presences, and demand entry.  From a law enforcement perspective, the described police procedures fully comport with professional training based on both federal and state guidelines.  (DSUF, No. 227)

21
22

On February 2, 2004, Shatera Dillingham was not a resident of 139 W. Eden Ave. (PSDF, No. 50)

23

      **ii.**    <u>Officer Garrison's Entry</u>

24

The following facts are also disputed:

25
26
27

    **1.**    Within seconds and a foot or two within the front doorway, Officer Garrison felt someone (Plaintiff) grab his right arm, which was holding his gun. (DSUF, No. 143)

28

    **2.**    Officer Higgins, who was directly behind Officer Garrison, and who was standing in the doorframe,

saw Plaintiff grab Officer Garrison's gun arm.
(DSUF, No. 144)

3.    Deputy Capriola, who was directly behind Officer
      Higgins and who was just outside the doorframe,
      also saw Plaintiff grab Officer Garrison's gun
      arm.  (DSUF, No. 145)

4.    Upon feeling someone grab his arm, Officer
      Garrison's immediate reaction was to use his left
      hand and push away the threat, which he perceived
      to be someone attempting to disarm him.  (DSUF,
      No. 149)

5.    As Officer Garrison pushed Plaintiff away from
      him, she continued to grab onto his arm, thereby
      causing the two to lose balance, entangle their
      feet, and Plaintiff fell over the arm of a chair
      then to the ground.  (DSUF, No. 151)

6.    Officer Garrison struggled with keeping his
      balance but was able to stay on his feet and he
      proceeded down the hall toward the back of the
      house to clear the residence.  (DSUF, No. 152)

7.    At the moment Officer Garrison felt the physical
      contact on his arm, he had no idea whether this
      person was the suspect, a fellow gang member or an
      innocent bystander.  (DSUF, No. 225)

         (a)   Freeman's Allegations

    Freeman testified that the Officers did not knock on the
front door, but instead, she saw them through a window and went
to open the door.  (DSUF, No. 213)  According to Freeman after
Plaintiff was knocked onto the floor, Officer Garrison told her
to get up or he would shoot her.  (DSUF, No. 214 - 215)

    Freeman denied having any dealings with gang members.
(PSDF, No. 47)  Further, Freeman was visibly upset. (PSDF, No.
48)  According to Freeman upon entry Garrison shouted to
Freeman, "Get down on the ground or I'll shoot you!"  (PSDF, No.
51)  As a direct result of the excessive force applied by the
Defendants, Freeman alleges that she suffered severe physical
and emotional injuries.  (PSDF, No. 55)

31

1

### iii. Deputy Capriola's Entry

2    Freeman disputes that as Deputy Capriola stood just outside

3 the doorway, he saw a hand from his right peripheral vision,

4 reach out and grab Officer Garrison's right, gun arm.  (DSUF,

5 No. 170)  Freeman also disputes that Deputy Capriola immediately

6 perceived this as a threat and thought this person was grabbing

7 for Officer Garrison's handgun.  (DSUF, No. 171)

8    ### iv.   Sergeant Barrimond

9    Freeman disputes the following facts:

10   1.   When Sergeant Barrimond reached Plaintiff's front
          door, he positioned himself underneath the front
11        window and waited while Officer Garrison knocked
          loudly on the metal, security door and gave the
12        appropriate notice.  (DSUF, No. 192)

13   2.   Barrimond indicated hearing a female voice from
          inside 139 W. Eden when they started knocking.
14        (PSDF, No. 37)

15   3.   Barrimond recalled the voice as saying either
          "I'm coming" or "who is it?"  (PSDF, No. 38)
16
     4.   Barrimond noted that the team had a ram and a
17        pick to force entry if necessary. (PSDF, No. 39)

18   5.   Barrimond gave the command "let's go" as soon as
          he saw Ms. Freeman's door knob turn. (PSDF, No.
19        40)

20   6.   Barrimond lost sight of the first member of the
          entry team for seconds.  (PSDF, No. 41)
21
     7.   Barrimond confirmed that all members of the entry
22        team had their weapons drawn upon entry. (PSDF,
          No. 42)
23
     8.   Right after the point of entry, Barrimond did not
24        notice Freeman and he didn't really pay attention
          to her. (PSDF, No. 43)
25
     9.   Upon entry, Barrimond saw and heard little
26        children crying. (PSDF, No. 44)

27   10.  Barrimond entered the house yelling at people to
          get down on the ground.  (PSDF, No. 45)
28

1

2

    11.   Barrimond was unable to see Freeman upon first
           entry. (PSDF, No. 49)

3

    4.   <u>Oversight and Training of Fresno Police Officers</u>

4

Freeman disputes the following with respect to the

5

oversight and training of police officers:

6

7

    1.   Officers employed with the Fresno Police
           Department are given training over and above that
           required by POST, (Peace Officer Standards and
           Training) the commission which regulates training
           for law enforcement officers in California.
           (DSUF, No. 229)

8

9

10

    2.   The Fresno Police Department had training units
           that ensured that the officers employed by the
           Department received training in compliance with
           POST.   (DSUF, No. 230)

11

12

    3.   The training provided to officers employed by the
           Department meets or exceeds POST guidelines.
           (DSUF, No. 231)

13

14

    4.   Prior to February 19, 2004, the Fresno Police
           Department provided training to all their
           officers including those assigned to the
           M.A.G.E.C. Unit receive training on topics,
           including but not limited to: (1) the appropriate
           means and manner of conducting a search and
           seizure, in light of the totality of the
           circumstances faced by the officers; (2) proper
           use of force; (3) proper investigation and
           acquisition of search warrants.   (DSUF, No. 232)

15

16

17

18

19

    5.   New police officer recruits are required go
           through a field training program and are required
           to complete 24 hours of POST training every 24
           months.   They also undergo a rigorous sixteen
           week training program which includes training on
           the appropriate use of force, including lethal
           force.   (DSUF, No. 233)

20

21

22

23

    6.   Officers are also provided training in the use of
           force, including lectures and scenario-based
           performances.   The Fresno Police Department's
           policy regarding the use of force is part of the
           instruction given in any class in which the use
           of force is reviewed.   (DSUF, No. 234)

24

25

26

27

    7.   Plaintiff's retained police procedural matters
           expert, Roger Clark, has expressed his opinion in
           this case, the training provided by Fresno Police
           Department to its police officers is consistent

28

1       with POST mandates.   (DSUF, No. 235)

2       8.      At all times relevant to this lawsuit, it has
                been the policy of the Fresno Police Department
3               to conduct thorough internal investigations into
                allegations of misconduct by employees of the
4               Department.   (DSUF, No. 238)

5       9.      It has also been the policy of the Fresno Police
                Department to take sufficient corrective action
6               to prevent their employees from committing
                constitutional violations, or any violations of
7               state or federal law.   (DSUF, No. 239)

8       10.     At no time relevant to this lawsuit has the
                Fresno Police Department had any policies,
9               practices or customs of the following: (1)
                tolerating the use of excessive or unjustified
10              force; (2) allowing constitutional violations by
                encouraging unlawful police activity, withholding
11              or concealing material information from a search
                warrant; (3) performing pretextual investigations
12              that vindicate and ratify an officer's
                misconduct; (4) taking insufficient corrective
13              actions to prevent alleged patterns of
                constitutional violations from continuing; (5)
14              delegation of obligations to manage, supervise,
                train and control officers; and/or (6) avoiding
15              proper public oversight of the actions of
                officers. (DSUF, No. 240)
16
        11.     The hiring process for new recruits with the
17              Fresno Police Department includes, among other
                matters, obtaining a background check and a
18              psychological evaluation of the applicant prior
                to hiring.  The applicant's propensity toward
19              untruthfulness is tested and used as a basis of
                exclusion of potential applicants.   (DSUF, No.
20              241)

21      12.     New recruits are required to undergo a rigorous
                sixteen week training program which includes
22              training on the appropriate use of force.  (DSUF,
                No. 242)
23
                        IV.   STANDARD OF REVIEW
24
A.      Summary Judgment Standard
25
        Summary judgment is warranted only "if the pleadings,
26
depositions, answers to interrogatories, and admissions on file,
27
together with the affidavits, if any, show that there is no
28

                                34

1   genuine issue as to any material fact."  Fed. R. Civ. P. 56©;

2   *California v. Campbell*, 138 F.3d 772, 780 (9th Cir. 1998).

3   Therefore, to defeat a motion for summary judgment, the non-

4   moving party must show (1) that a genuine factual issue exists

5   and (2) that this factual issue is material.  *Id.*  A genuine

6   issue of fact exists when the non-moving party produces evidence

7   on which a reasonable trier of fact could find in its favor

8   viewing the record as a whole in light of the evidentiary burden

9   the law places on that party.  *See Triton Energy Corp. v. Square*

10  *D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995); *see also Anderson v.*

11  *Liberty Lobby, Inc.*, 477 U.S. 242, 252-56 (1986).  Facts are

12  "material" if they "might affect the outcome of the suit under

13  the governing law."  *Campbell*, 138 F.3d at 782 (quoting

14  *Anderson*, 477 U.S. at 248).

15      The nonmoving party cannot simply rest on its allegations

16  without any significant probative evidence tending to support

17  the complaint.  *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th

18  Cir. 2001).

19              [T]he plain language of Rule 56(c) mandates the
            entry of summary judgment, after adequate time
20          for discovery and upon motion, against a party
            who fails to make a showing sufficient to
21          establish the existence of an element essential
            to the party's case, and on which that party
22          will bear the burden of proof at trial.  In
            such a situation, there can be "no genuine
23          issue as to any material fact," since a
            complete failure of proof concerning an
24          essential element of the nonmoving party's case
            necessarily renders all other facts immaterial.
25

26  *Celotex Corp. v. Catrell*, 477 U.S. 317, 322-23 (1986).  The more

27  implausible the claim or defense asserted by the nonmoving

28  party, the more persuasive its evidence must be to avoid summary

35

1   judgment.  *See United States ex rel.  Anderson v. N. Telecom,*
2   *Inc.*, 52 F.3d 810, 815 (9th Cir. 1996).  Nevertheless, the
3   evidence must be viewed in a light most favorable to the
4   nonmoving party.  *Anderson*, 477 U.S. at 255.  A court's role on
5   summary judgment is not to weigh evidence or resolve issues;
6   rather, it is to determine whether there is a genuine issue for
7   trial.  *See Abdul-Jabbar v. G.M. Corp.*, 85 F.3d 407, 410 (9th
8   Cir. 1996).

9   B.   <u>Summary Judgment in a Qualified Immunity Case</u>

10          In this case, Defendants assert the defense of qualified
11  immunity on behalf of all the individual defendants.  Deciding
12  qualified immunity entails a two-step analysis.  First, a court
13  must ask whether a constitutional violation occurred at all.  If
14  the answer to this question is yes, the court must then inquire
15  whether the right violated was "clearly established" by asking
16  whether a reasonable officer could believe that the defendant's
17  actions were lawful.  *See Saucier v. Katz*, 533 U.S. 194, 201
18  (2001).

19          The traditional summary judgment approach should be used in
20  analyzing the first step of the *Saucier* analysis:

21                A court required to rule upon the qualified immunity
              issue must consider, then, this threshold question:
22            Taken in the light most favorable to the party
              asserting the injury, do the facts alleged show the
23            officer's conduct violated a constitutional right?
              Where the facts are disputed, their resolution and
24            determinations of credibility are manifestly the
              province of a jury.
25
26  *Wall v. County of Orange*, 364 F.3d 1107, 1110-1111 (9th Cir.
    2004) (internal citations and quotations omitted).  In the
27
    second step, the court must ask whether it would be clear to a
28

                                    36

1 reasonable officer that his conduct was unlawful in the

2 situation confronted.  Although this inquiry is primarily a

3 legal one, where the reasonableness of the officer's belief that

4 his conduct was lawful "depends on the resolution of disputed

5 issues of fact...summary judgment is not appropriate." *Wilkins*

6 *v. City of Oakland*, 364 F.3d 949, 1110-11 (9th. Cir. 2003)

7 (citing *Saucier*, 533 U.S. at 216 (Ginsburg J., concurring)).

8 C.   Civil Rights Claims Under 42 U.S.C. section 1983

9        "Section 1983 provides for liability against any person

10 acting under color of law who deprives another 'of any rights,

11 privileges, or immunities secured by the Constitution and laws'

12 of the United States." *S. Cal. Gas Co. v. City of Santa Ana*,

13 336 F.3d 885, 887 (9th Cir. 2003)(quoting 42 U.S.C. § 1983).

14 "The rights guaranteed by section 1983 are 'liberally and

15 beneficently construed.'" *Id*. (quoting *Dennis v. Higgins*, 498

16 U.S. 439, 443 (1991).  Pursuant to 42 U.S.C. § 1983, Plaintiff

17 may bring a civil action for deprivation of rights under the

18 following circumstances:

19        Every person who, under color of any statute,
         ordinance, regulation, custom, or usage, of any State
20       or Territory or the District of Columbia, subjects, or
         causes to be subjected, any citizen of the United
21       States or other person within the jurisdiction thereof
         to the deprivation of any rights, privileges, or
22       immunities secured by the Constitution and laws, shall
         be liable to the party injured in an action at law,
23       suit in equity, or other proper proceeding for
         redress, except that in any action brought against a
24       judicial officer for an act or omission taken in such
         officer's judicial capacity, injunctive relief shall
25       not be granted unless a declaratory decree was
         violated or declaratory relief was unavailable. For
26       the purposes of this section, any Act of Congress
         applicable exclusively to the District of Columbia
27       shall be considered to be a statute of the District of
         Columbia.

28

37

1    D.    **Fourth Amendment**

2          Under the Fourth Amendment the right of the people to be

3    secure in their persons, houses, and effects, against

4    unreasonable searches and seizures, shall not be violated.   U.S.

5    Const. amend. IV.; *Menotti v. City of Seattle,* 409 F. 3d 1113,

6    1152 (9th Cir. 2005).   The Supreme Court has held that "in the

7    ordinary case, seizures of personal property are unreasonable

8    within the meaning of the Fourth Amendment, without more, unless

9    accomplished pursuant to a judicial warrant issued by a neutral

10   and detached magistrate after finding probable cause.   *Id.*

11   However, when faced with special law enforcement needs, the

12   Supreme Court has found that certain general, or individual,

13   circumstances may render a warrantless search or seizure

14   reasonable.   *Id.*

15   E.    **The *Monell* Doctrine**

16         Local governments[6] are "persons" subject to suit for

17   "constitutional tort[s]" under 42 U.S.C. § 1983.[7]   *Haugen v.*

18   _____

19         [6] Although *Monell* dealt with a municipal government's
     liability under § 1983, the standard there announced was
20   more broadly framed in terms of "a local government."   *Brass*
     *v. County of L.A.*, 328 F.3d 1192, 1198 (9th Cir. 2003).
21

22         [7] "There is certainly no constitutional impediment to
     municipal liability.   'The Tenth Amendment's reservation of
23   nondelegated powers to the States is not implicated by a
     federal-court judgment enforcing the express prohibitions of
24   unlawful state conduct enacted by the Fourteenth
     Amendment.'"   *Monell*, 436 U.S. 691 (quoting *Milliken v.*
25   *Bradley*, 433 U.S. 267, 291 (1977)).   There is no "basis for
     concluding that the Eleventh Amendment is a bar to municipal
26   liability."   *Id.* (citing *Fitzpatrick v. Bitzer*, 427 U.S.
     445, 456 (1976); *Lincoln County v. Luning*, 133 U.S. 529, 530
27   (1890)).

28

*Brosseau*, 339 F.3d 857, 874 (9th Cir. 2003) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 n.55 (1978)) (also finding the fact that "local governments can be sued under § 1983 necessarily decides that local government officials sued in their official capacities are "persons" under § 1983 in those cases in which, as here, a local government would be suable in its own name"). "[T]he legislative history of the Civil Rights Act of 1871 compels the conclusion that Congress did intend municipalities and other local government units to be included among those persons to whom § 1983 applies." *Id.* at 690. "Local governing bodies, therefore, can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers...[or for] deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decision making channels."[8]   *Id.* 690-91.

---

8 In *Brass v. County of Los Angeles*, the Ninth Circuit followed evolution of municipal liability from *Monroe* to *Monell*:

> In *Monroe v. Pape*, 365 U.S. 167 [](1961), the Supreme Court held that municipal corporations were not subject to liability under § 1983.  In *Monell*, 436 U.S. at 665, the Court, based upon its "fresh" review of the legislative history of the Civil Rights Act of 1871 (the statutory predecessor to § 1983), "overrule[d] *Monroe v. Pape*...insofar as it holds that local governments are wholly immune from suit under § 1983."  *Id*. at 663 (footnote omitted).  The

A local government's liability is limited.  Although a local government can be held liable for its official policies or customs, it will not be held liable for an employee's actions outside of the scope of these policies or customs.  "[T]he language of § 1983, read against the background of the same legislative history, compels the conclusion that Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort.  In particular,...a municipality cannot be held liable solely because it employs a tortfeasor, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory."  *Monell*, 436 U.S. at 691.  The statute's "language plainly imposes liability on a government that, under color of some official policy, [that] 'causes' an employee to violate another's constitutional rights."  *Id*. at 692.  Therefore, "a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents.  Instead, it is when execution of a government's policy or custom, whether made by its law-makers or by those whose edicts or acts may

---

Court, however, upheld *Monroe* "insofar as it holds that the doctrine of respondeat superior is not a basis for rendering municipalities liable under § 1983 for the constitutional torts of their employees."  *Id*. at 663 n.7. It stated that "the language of § 1983, read against the background of the same legislative history, compels the conclusion that Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort."  *Id*. at 691.

328 F.3d at 1198.

fairly be said to represent official policy, inflicts the injury
that the government as an entity is responsible under § 1983."
*Id*. at 694.

F.    Suits Against Government Officials: Official Capacity and
      Individual Capacity Suits

      "1983 claims against government officials in their official
capacities are really suits against the governmental employer
because the employer must pay any damages awarded." *Butler v.
Elle*, 281 F.3d 1014, 1023 (9th Cir. 2002) (citing *Ky. v. Graham*,
473 U.S. 159, 165-66 (1985)); *see also Doe v. Lawrence Livermore
Nat'l Lab.*, 131 F.3d 836, 839 (9th Cir. 1997) (finding that "a
suit against a state official in his official capacity is no
different from a suit against the [official's office or the]
State itself")(citing *Will v. Mich. Dep't of State Police*, 491
U.S. 58, 70-71 (1989).  In such suits, the real party in interest
is the entity for which the official works. *Hafer v. Melo,* 502
U.S. 21, 25 (1991).  A federal action for monetary damages
against an individual state official acting in his official
capacity is barred by the Eleventh Amendment in the same way that
an action against a State is barred. *Doe v. Lawrence Livermore
Nat'l Lab.,* 131 F.3d 836, 839 (9th Cir. 1997).  "As the Supreme
Court has stated, 'official-capacity suits...generally represent
only another way of pleading an action against an entity of which
an officer is an agent.'" *Ruvalcaba v. City of Los Angeles*, 167
F.3d 514, 524 n.3 (9th Cir. 1999) (quoting *Graham*, 473 U.S. at
165).  "'As long as the government entity receives notice and an
opportunity to respond, an official-capacity suit is, in all
respects other than name, to be treated as a suit against the

41

1  entity.'"  *Ruvalcaba*, 167 F.3d at 524 n.3 (quoting *Graham*, 473
2  U.S. at 166.)

3      By contrast, "[p]ersonal-capacity suits seek to impose
4  personal liability upon a government official for actions [taken]
5  under color of state law."  *Dittman v. California*, 191 F.3d 1020,
6  1027 (9th Cir. 1999)(*citing Kentucky v. Graham*, 473 U.S. 159, 165
7  (1985))(internal quotations omitted).  To establish personal
8  liability in a §1983 or §1985 action, it is enough to show that
9  the official, "acting under color of state law, caused the
10  deprivation of a federal right."  *Hafer,* 502 U.S. at 25 (internal
11  quotations omitted).  Public officials sued in their personal
12  capacity may assert personal liability defenses, such as
13  qualified immunity.  *Dittman,* 191 F.3d at 1027.

14                    **V.   DISCUSSION**

15  **A.   Federal Claims**

16      1.   **Qualified Immunity of the Individual Defendant Officers**

17      Defendants assert qualified immunity for the individual
18  officers in this case.  Qualified immunity grows out of the
19  policy concern that few individuals would enter public service if
20  they risked personal liability for their official decisions.
21  *Harlow v. Fitzgerald*, 457 U.S. 800, 814 (1982).  The immunity
22  protects "all but the plainly incompetent or those who knowingly
23  violate the law,"  *Hunter v. Bryant*, 502 U.S. 224, 228 (1991),
24  and "spare[s] a defendant not only unwarranted liability, but
25  unwarranted demands customarily imposed upon those defending a
26  long drawn out lawsuit."  *Siegert v. Gilley*, 500 U.S. 226, 232
27  (1991).  Qualified immunity is not a defense on the merits; it is
28  an "entitlement not to stand trial or face the burdens of

                              42

1  litigation" that may be overcome only by a showing that (1) a

2  constitutional right was in fact violated and (2) no reasonable

3  officer could believe defendant's actions were lawful in the

4  context of fact-specific, analogous precedents. *Saucier v. Katz*,

5  533 U.S. 194, 200-202 (2001).

6      Here, Freeman alleges that Defendant Officers violated her

7  Fourth Amendment right based on an allegedly unreasonable search

8  and seizure of her home.  Freeman claims the search and seizure

9  was illegal because (1) Detective Yee's affidavit in support of

10 the warrant contained material misrepresentations and failed to

11 establish probable cause and (2) Defendants Garrison, Capriola,

12 Barrimond, Hollins, Perez, and Simons "acted unreasonably" and

13 with excessive force[9] in their conduct in executing said warrant

14 and detaining plaintiff.[10]  Because it is undisputed that

15 Detective Yee was not present during the execution of the search

16 warrant, Freeman's claims require a different qualified immunity

17 inquiry for Detective Yee than the remaining Defendant Officers.

18          i.   Detective Yee

19      Freeman can only survive summary judgment on a Yee's defense

20 of qualified immunity if she can establish both (1) a substantial

21

22      [9] Plaintiff offers a litany of facts that would support an
   excessive force claim.  However, Plaintiff has not asserted a
23 Fourth Amendment violation based on excessive force.  Such facts
   are still relevant to the reasonableness of executing the search
24 warrant.
25      [10] In their motion papers the parties make arguments in
   reference to alleged excessive use of force.  However, Freeman
26 does not bring an excessive use of force claim.  For the purposes
   of this motion the inquiry as to the individual officers' inquiry
27 is limited to their actions in reliance on the executed search
   warrant.
28

43

showing of a deliberate falsehood or reckless disregard by Yee
and (2) that but for the dishonestly included or omitted
information, the magistrate would not have issued the warrant.
*Butler v. Elle,* 281 F.3d 1014, (9th Cir. 2002); *Hervey v. Estes*,
65 F. 3d 784, 789 (9th Cir. 1995)  Put another way, Freeman must
establish that the remaining information in the affidavit is
insufficient to establish probable cause.  *Hervey,* 65 F. 3d at
789.

          (a)   <u>Freeman Fails to Show a Substantial Showing</u>
                 <u>by Yee's of Deliberate Falsehood or Reckless</u>
                 <u>Disregard</u>

     If an officer submitted an affidavit that contained
statements he knew to be false or would have know to be false had
he not recklessly disregarded the truth, he cannot be said to
have acted in an objectively reasonable manner.  *Butler v. Elle,*
281 F.3d 1014, 1024 (9th Cir. 2002.)

     Plaintiff argues that Yee had knowledge his affidavit
contained false statements.  According to Plaintiff, Yee did not
take Monique Thomas' complaint and he knew that Detective Andreas
and Torres were unable to corroborate her information.  (PSUF,
No. 53)  Plaintiff argues that Yee knew that there were
inconsistencies in Monique Thomas' statement.  However, Plaintiff
fails to establish how failure to corroborate witness testimony
makes such testimony false or establishes Yee's deliberate
falsehood.

     In support of her arguments, Freeman disputes the fact that
Detective Yee received credible information from reliable
sources, including confidential informants, and continued to

1  monitor the information provided to him from those informants.

2  (DSUF, No. 4).  Freeman also disputes that the twenty-four page

3  statement of probable cause in support of the Search Warrant

4  accurately described the one and a half year investigation

5  arising out of the gang related shootings in Fresno and other

6  criminal acts committed by members of the West Side Strother Boys

7  and Garrett Street gangs.  (DSUF, No. 6)

8       Freeman argues that Detective Yee's affidavit lacked

9  adequate foundation for the reliability of any of the

10 confidential and/or anonymous sources.  (PSDF, No. 1)  Freeman

11 also argues that Detective Yee lacked personal corroboration

12 information regarding the confidential/anonymous sources which

13 had been deemed "reliable" by Officers other than Detective Yee.

14      Freeman offers no support in the form of affidavits,

15 exhibits, or any other information or evidence to show that Yee

16 did not receive credible information from reliable sources,

17 including confidential informants or that his declaration was not

18 made in good faith.  Freeman disputes the accuracy of Yee's

19 affidavit by arguing that:

20      1.   Yee did not ensure the reliability of several
             confidential informants he used to gather his
21           information

22      2.   Yee did not know or speak to several of the
             confidential informants to determine the accuracy
23           of the information they provided

24      3.   There is no way of telling the reliability of
             these informants because that information is
25           contained in the sealed portion of the affidavits

26      4.   Detective Yee did not take Monique Thomas'
             complaint and knew that Detective Andreas and
27           Detective Torres were unable to corroborate her
             information

28

1    Freeman further argues that, based on his investigation,

2   Detective Yee was not reasonable in concluding the following:

3        1.   That the ten residences searched were in
              possession of weapons and gang indicia that had
4             been used in the gang related shootings he was
              investigating.

5
         2.   That surveillance conducted of Darryl Hilliard
6             determined an association between him and the ten
              residences.

7
         3.   That there was a strong possibility that  evidence
8             of gang membership, firearms and ammunition would
              be found at these homes.

9
         4.   That the search warrant should be a "high risk"
10            warrant because it involved the search for
              weapons, mostly firearms and gang indicia

11
         5.   That he had a good faith belief that there was
12            sufficient probable cause to justify the issuance
              of the warrant, that the warrant was not
13            overbroad, that the warrant was lawful, and that
              the informants used were reliable.

14
        However, Freeman does not dispute that Yee knew that at the

15  time the warrant was sought, a long history of violence existed

16  between the Strother Boys and the Garret Street gangs and that

17  these incidents were described in Yee's affidavit.  Plaintiff

18  admits that her residence is located in an area well known for

19  criminal street gang activity and violence where most of the

20  gang-related shootings in the southwest occur.  Freeman also

21  admits that Hilliard's mother dropped off Hilliard at her

22  residence and drove away without him. Further, later that same

23  day, after a court appearance at the Fresno County Courthouse,

24  Hilliard was observed getting into Freeman's automobile.  While

25  Freeman disputes that her granddaughter, Shatera Dillingham lived

26  with her for a significant period of time and that Shatera was

27  still Hilliard's girlfriend at this point.  Plaintiff does not

28

                                  46

1    dispute that Dillingham drove Hilliard to his mother's house at

2    high speeds making quick turning movements as Hilliard leaned

3    down in the front passenger seat to conceal himself.   Plaintiff

4    does not dispute that Hilliard was a suspected gang member.

5         Further, on February 2, 2004, after attending court Hilliard

6    was observed driving Freeman's vehicle to various locations,

7    where he made contact with several Strother Boy gang affiliates.

8    Freeman admits that Hilliard's behavior while driving her car was

9    consistent with that counter-surveillance activities of a person

10   involved in dealing drugs.   Further Freeman also does not dispute

11   that it is common practice for gang members to keep their

12   weaponry, stolen property, and other evidence of their crime

13   involvement at their homes or "safe houses."   Freeman does not

14   dispute that a gang member will attempt to evade detection by the

15   police by moving their property among associates, members, and

16   girlfriends within their own gang.

17        Viewing the facts in dispute in Freeman's favor, the

18   undisputed facts do not show that Yee's affidavit was based on

19   deliberate falsehood or reckless disregard, because Yee had

20   extensive knowledge of local West Fresno gang members and that

21   his conclusions came as the result of a one and a half year

22   investigation into gang violence between Strother Boys and Garret

23   Street Gangs.   The undisputed facts also show and Plaintiff

24   cannot credibly deny that Hilliard is a violent gang member of

25   the West Side Strother Boys; Hilliard had numerous contacts with

26   Freeman's granddaughter Shatera, rode in Freeman's car; and was

27   in Freeman's residence on more than one occasion prior to the

28   search.   Further, Freeman's objection to Yee's reliance on

1  confidential informants and witnesses in no way establishes that

2  Yee's affidavit was based on falsehood and misrepresentation to

3  the court.

4              (b)    Even if Freeman's Disputes As to the

5                     Confidential Informants and Witnesses Are

6                     Sufficient to Show Misrepresentations in the

7                     Affidavit, Such Misrepresentations Are Not So

8                     Material That the Warrant Would Not Have Been

9                     Issued

10      Even assuming arguendo the alleged failings in portions of

11  Yee's declaration, it cannot be said that the search warrant

12  would not have been issued but for the alleged misrepresentations

13  by Yee obtained from reliance on confidential informants and

14  witnesses.  Freeman does not dispute that Yee observed Hilliard,

15  a violent Strother Boy gang member was present in Plaintiff's,

16  Hilliard's, house, drove around in her car; and had a

17  relationship with Plaintiff's grandaughter.  Where a law

18  enforcement officer's observations support a reasonable belief

19  that a parolee resides at a particular address, this provides a

20  reasonable basis for a parole search.  *Motley v. Parks*, 432 F.3d

21  1072, 1078 (9th Cir. 2005.)  The undisputed facts show that

22  Detective Yee's year and a half long investigation of the

23  Strother Boys and Garret Street gang and Hilliard's involvement

24  as described, was fully sufficient to establish the requisite

25  probable cause for a search warrant.

26      Plaintiff cannot deny Hilliard was a violent gang member and

27  convicted felon.  On the basis of all the evidence known to Yee,

28  he had a duty to seek a search warrant to lawfully endeavor to

48

1  locate the suspected weapon used in a gang shooting.   Summary
2  judgment in favor of Defendant Yee is GRANTED.

3                 ii.  __Defendant Officers' Reliance on the Search Warrant__
4       To establish a Fourth Amendment violation by Defendants
5  Garrison, Capriola, Barrimond, Hollins, Perez, and Simons Freeman
6  must show they (1) unreasonably relied on the search warrant to
7  conduct the search of her residence and, if so, (2) that no
8  reasonable officer, confronting the same circumstances and with
9  the same information, would have executed the warrant and made
10 their entry into Freeman's home the same way. *See Saucier,* 533
11 U.S. at 202.

12                 (a)  __Defendant Officers Were Not Unreasonable In__
13                      __Relying on a Valid Search Warrant to Conduct__
14                      __Their Search of Freeman's Home__

15      A warrant must name the places to be searches and the items
16 to be seized with reasonable precision.  *United States v. Mann*,
17 389 F.3d 869, 877 (9th Cir. 2004).  While a search warrant must
18 describe items to be seized with particularity sufficient to
19 prevent a general, exploratory rummaging in a person's
20 belongings, it need only be reasonably specific rather than
21 elaborately detailed.  *Id.*

22      It is undisputed that the ten residences were listed and
23 described with particularity in Attachment "A" to the Search
24 Warrant Affidavit.  (DSUF, No. 58)  The items to be seized
25 included evidence of gang membership, firearms and ammunition,
26 and were specifically listed in Attachment "B" to the Search
27 Warrant Affidavit.  (DSUF, No. 59)  Detective Yee had probable
28 cause to believe, and did believe, that the property described in

1 | Attachment "B" to the Affidavit was lawfully seizable pursuant to
2 | California Penal Code Section 1524.  (DSUF, No. 60)

3 | It is also undisputed that on or about February 17, 2004,
4 | Detective Yee took the Search Warrant Affidavit and Confidential
5 | Attachment to the Honorable Judge Franklin P. Jones' chambers in
6 | the Fresno County Superior Court.  (DSUF, No. 63)  Detective Yee
7 | believed that Judge Jones was a detached and neutral magistrate
8 | at the time he presented the Search Warrant Affidavit to him.
9 | There is no evidence to the contrary.  (DSUF, No. 64) Freeman
10 | does not dispute that Judge Jones signed the Search Warrant after
11 | thorough review on February 17, 2004 and authorized the search of
12 | the ten residences.  (DSUF, No. 69)  Judge Jones ordered the
13 | confidential portion of the Affidavit to be sealed, which was
14 | kept in the custody of the Fresno County Superior Court.  (DSUF,
15 | No. 70)  All the officers who participated in the service of this
16 | Search Warrant understood that this was a "high risk" warrant due
17 | to the nature of the underlying crimes being committed by the
18 | suspect Darryl Hilliard that included homicide, gang-related
19 | shootings, and other criminal activity.  Freeman also does not
20 | dispute that the officers also understood they were searching for
21 | firearms, ammunition, gang indicia and other evidence of criminal
22 | activity.  (DSUF, No. 223)  Plaintiff had the right to obtain the
23 | confidential portion of the search warrant affidavit in discovery
24 | in this case and apparently failed to do so.

25 | The search warrant in this case was not overbroad or
26 | insufficiently particular.  Officers in this case reasonably
27 | relied on a search warrant issued by a detached and neutral
28 | magistrate.

1                              **(b)**    **A Reasonable Officer Confronting the Same**

2                                       **Circumstances and With the Same Information**

3                                       **Would Have Executed the Search Warrant In the**

4                                       **Same Manner**

5     While Freeman does not bring an excessive force claim, she

6 argues that police conduct was unreasonable in executing the

7 warrant upon entry into her home when she was knocked on the

8 floor.

9                              **(1)**    **Undisputed Facts Regarding Officers'**

10                                      **Briefing**

11     It is undisputed that On the morning of February 19, 2004,

12 all officers who were to participate in serving the Search

13 Warrant, met at the M.A.G.E.C. headquarters for a briefing before

14 the search. (DSUF, No. 114) Members of this team consisted

15 primarily of Fresno County Sheriff Deputies, who included:

16 Defendants Ian Barrimond, John Capriola, Jason Hollins, Robert

17 Perez, and Andrew Simonson; as well as Fresno Police Officer

18 Robert Garrison. During the briefing, Detective Yee provided all

19 the officers with the following:

20       1.    a background of his investigations

21       2.    a history of the ongoing gang-related shootings

22       3.    the nature of the Search Warrant and information
              regarding suspect Darryl Hilliard
23

24       4.    a photograph of Darryl Hilliard

25       5.    the locations to be searched

26       6.    copies of the list of items authorized to be
              searched for and seized

27       7.    and a copy of the Notice of Search Warrant that
              each team was to serve on the occupants of the
28               residences

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Detective Yee cautioned the officers that they were serving a "high risk" Search Warrant and to expect for Darryl Hilliard or his fellow gang members and/or associates, to be at any of the locations.  He also cautioned that it was very likely that such individuals would be armed.

### (2)   Search of Freeman's Residence

It is also undisputed that all the officers who participated in the service of the Search Warrant understood that it was "high risk" due to the nature of the underlying crimes being committed by the suspect Darryl Hilliard.  These crimes included homicide, gang related shootings, and other criminal activity. All the officers understood that Hilliard was a validated gang member whose fellow gang members and associates were very dangerous.  Freeman does not dispute that the officers also understood they were searching for firearms, ammunition, gang indicia and other evidence of criminal activity.

It is undisputed that Plaintiff's front door is on a two step elevation from the ground.  The house has barred windows on each side of the front door.  (DSUF, No. 128)  Officer Garrison did not stand in front of the door but positioned himself directly under the right front window on the ground level. (DSUF, No. 130)  Officer Garrison had his department issued handgun in his right hand, and used his left hand to bang on the security door.  (DSUF, No. 131)  He checked and confirmed the security door was locked.  (DSUF, No. 133)

Plaintiff, who was inside the residence, did not immediately open the door and the Officers on the stick were growing

1   concerned that the team was taking too long to make entry.  After
2   a lengthy period of time, the interior door finally opened.
3   (DSUF, No. 134)  Plaintiff, responded, "what do you want?"
4   (DSUF, No. 136)  Officer Garrison continued to tell Plaintiff to
5   open the door.  (DSUF, No. 137)  Plaintiff finally unlocked the
6   security door at which point Officer Garrison grabbed the door
7   handle and pulled the door open.  (DSUF, No. 138)  Officer
8   Garrison stepped onto the front step and made entry into the
9   home, he was telling Plaintiff to get down on the floor.  (DSUF,
10  No. 139)  Plaintiff was verbally abusive to Officer Garrison as
11  well as the Paramedics who arrived on scene.  (DSUF, No. 243)
12  There was no cover or concealment for any of the officers who
13  were in that doorway.  (DSUF, No. 146)  The doorway is known as
14  the "funnel of death".  This is due to the high likelihood of
15  officers being injured or killed in the doorway because of the
16  backlighting.  Therefore it is necessary to get through the
17  doorway as quickly and safely as possible.  This ensures the
18  safety of the officers and the subjects of the residence.  (DSUF,
19  No. 148)

20      However, Freeman disputes the following facts related to the
21  entry to her residence:

22      1.   The officers were unable to see through the locked
             security door and could not tell whether or not
23           the interior door was opened.  (DSUF, No. 129)

24      2.   Officer Garrison knocked loudly on the door and
             shouted words similar to, "Police Department,
25           Search Warrant, Open the door!" several times.
             (DSUF, No. 132)
26
27      3.   Again, Officer Garrison shouted,  "Police
             Department, Search Warrant, Open the door!"
28           (DSUF, No. 135)

53

1

      4.   Defendants served the Search Warrant lawfully, professionally and ethically.  (DSUF, No. 158)

2

      5.   All the officers understood that Darryl Hilliard or any of his fellow gang members or affiliates could be at Plaintiff's residence and possibly armed.  (DSUF, No. 224)

      6.   Given the totality of the available information, including two independent civilian witnesses, Defendants' Police Practices Expert, Joseph Callanan agrees that these officers complied with standard police procedures in their approach to the Plaintiff's residence and in their verbal announcements attempting to identify themselves, establish the reason for their presences, and demand entry.  From a law enforcement perspective, the described police procedures fully comport with professional training based on both federal and state guidelines.  (DSUF, No. 227)

These disputes raise the issue whether the search warrant was lawfully executed and whether Defendants' handling of Plaintiff effected an unlawful seizure under the Fourth Amendment.

### (3) <u>Sergeant Barrimond</u>

It is undisputed that prior to embarking to the Plaintiff's residence, Sergeant Barrimond obtained, reviewed and familiarized himself with a copy of the entire Search Warrant Affidavit and attachments because he wanted to be comfortable with it since his team did not write the Search Warrant.  (DSUF, No. 190)

When the team arrived at Plaintiff's residence, Sergeant Barrimond got in position about the fourth or fifth officer in the entry "stick."  (DSUF, No. 191)  Officer Garrison continued to knock, but no one from within the residence opened the door.  (DSUF, No. 193)  The team waited a reasonable period of time before receiving a response from within the residence, that Sergeant Barrimond almost ordered the team to force entry by using the breaching device.  (DSUF, No. 194)

1    During the knocking Barrimond heard a voice from within the
2  home.  Finally the occupant of the home unlocked the door at
3  which point Sergeant Barrimond gave the  command, "let's go".
4  (DSUF, No. 195)  Sergeant Barrimond was concerned about the
5  officers being in the "funnel of death" because they did not know
6  whether there was anyone within the residence who had weapons.
7  (DSUF, No. 196)  The officers had a disadvantage because the
8  sunlight was behind them, so they were backlit and the interior
9  of Plaintiff's residence was somewhat dark. (DSUF, No. 197)

10    After making entry, Sergeant Barrimond'S eyes had to
11  acclimate to the dimness of the house.  (DSUF, No. 198)  After
12  the residence was secured, Sergeant Barrimond focused his
13  attention on Plaintiff who was leaning on a chair, and the
14  children who were on the couch in the living room.  (DSUF, No.
15  199)

16    The facts raise a question whether Sergeant Barrimond was
17  reasonable in his execution of the search warrant.  He gave the
18  command to enter based upon the belief that persons inside the
19  residence were not responding.  Plaintiff declares that she
20  answered the door and there was no need for forced entry.  The
21  facts show that once inside the residence, Sergeant Barrimond
22  helped Plaintiff get seated on a chair and explained to her why
23  the officers were there and the purpose of their search.  He
24  advised her that the officers were looking for guns and gang-
25  related items pursuant to a search warrant.  Further, in an
26  attempt to calm the children in the house, Sergeant Barrimond
27  then began talking to the children and tried to make funny faces
28  and small talk to make them comfortable.  (DSUF, No. 202)  He

1   asked Plaintiff if the kids needed to be changed, fed or taken

2   care of in any way.   (DSUF, No. 203)

3       Plaintiff was not arrested or cited for any offense, nor was

4   she ever subjected to a pat down search, placed in handcuffs or

5   restrained in any other way.   In fact, she was allowed to use the

6   telephone to receive and make phone calls.   (DSUF, No. 206)

7       Sergeant Barrimond asked Plaintiff if she was okay and

8   whether or not she would like an ambulance called.   (DSUF, No.

9   195)   Plaintiff complained of hip pain but refused the offer to

10  have an ambulance called. (DSUF, No. 207)   Nevertheless, Sergeant

11  Barrimond directed Officer Garrison to call an ambulance because

12  he wanted to make sure Plaintiff was okay.   When the paramedics

13  arrived, Plaintiff refused treatment. (DSUF, No. 208)

14      Freeman however argues that Barrimond entered the house

15  yelling at people to get on the ground and that he in fact did

16  see Freeman upon first entry, contrary to what he claims.

17      If a trier of fact believes Plaintiff's version of the

18  events, there was no need for forced entry to execute the search

19  warrant.

20      Summary Judgment in favor of Sergeant Barrimond is DENIED.

21                  (4)   Officer Garrison

22      Freeman does not dispute that Officer Garrison immediately

23  entered the residence but was not able to clearly see inside due

24  to a brief eye adjustment caused by coming in from outside where

25  it was bright and sunny, into a small, dimly lit room.   It is

26  further undisputed that given the amount of time between Officer

27  Garrison entering the residence, feeling a perceived threat to

28  his gun arm, combined with his inability to see clearly, and his

1  men directly behind him moving quickly, he did not have

2  sufficient time to evaluate the age and characteristics of this

3  individual.   Ordinarily, a search warrant entry should be very

4  rapid, and although the momentum of the officers on this team was

5  originally quick, the entry was much slower due Officer

6  Garrison's encounter with Plaintiff.

7      After the home was secured, Officer Garrison returned to the

8  living room area, which was the first time he realized Plaintiff

9  was an elderly female.  Officer Garrison inquired as to whether

10 Plaintiff was okay and offered to call her an ambulance, but she

11 refused.   He asked her for her name, but she was uncooperative

12 and verbally abusive towards him.   Plaintiff does not dispute

13 these facts.  Officer Garrison did not want to aggravate the

14 tension Plaintiff  was already exhibiting, so, he limited his

15 contact with her.   (DSUF, No. 156)  Officer Garrison as well as

16 all the officers on this team deny that Officer Garrison ever

17 threatened to shoot Plaintiff.   (DSUF, No. 216)

18     However, there is a factual dispute as to whether Garrison

19 felt someone grab his right arm which was holding his gun.

20 Plaintiff says she did not.   There is also dispute as to whether

21 Garrison pushed plaintiff away from him and whether she continued

22 to grab his arm, thereby causing the two to lose balance and

23 entangle their feet.  Lastly, there is a factual dispute as to

24 whether Garrison yelled at Freeman to "Get down on the ground, or

25 I'll shoot you!"  The facts raise a dispute as to whether a

26 reasonable officer confronting the same circumstances as

27 Garrison, with the same information under the totality of

28 circumstances, would have made forced entry into Freeman's home

1  in the same manner.  Whether Freeman's Fourth Amendment rights to
2  be free of an unreasonable search and seizure and injured as a
3  result, remain in dispute.

4       Summary Judgment in favor of Officer Garrison is DENIED.

5                      (5)  Deputy Capriola

6       It is undisputed that Deputy Capriola was the third officer
7  who entered Plaintiff's residence, behind Officer Higgins, who
8  was behind Officer Garrison. Once inside the door, Deputy
9  Capriola observed Plaintiff laying partially on the ground and
10 halfway on a chair that was situated a foot or two on the right,
11 inside the door.  (DSUF, No. 175)  Plaintiff's legs were sticking
12 out partially in the doorway but Deputy Capriola did not see how
13 it was she landed in that position.  (DSUF, No. 176)  Deputy
14 Capriola stepped over Plaintiff's feet and went left into the
15 kitchen to secure that area.  (DSUF, No. 177)  After the house
16 was determined to be secured, he walked over to the Plaintiff and
17 assisted Sergeant Barrimond in helping Plaintiff to a couch.
18 (DSUF, No. 178)  Deputy Capriola had no further contact or
19 communication with Plaintiff.  (DSUF, No. 179)

20      Plaintiff fails to offer any evidence that Deputy Capriola's
21 entry and conduct was unreasonable or that he acted unlawfully in
22 any way, because he had no command responsibility, made no
23 independent decision to force entry, and did not use force of any
24 kind against anyone.

25      Summary judgment in favor of Deputy Capriola is GRANTED.

26                      (6)  Deputy Simpson

27      Plaintiff does not dispute that Deputy Simonson remained
28 outside of the residence securing the perimeter until the entry

                                58

1  team was done securing the interior of the residence.  (DSUF, No.

2  163)  Deputy Simonson then went inside the residence to assist in

3  documenting evidence seized on an inventory log.  (DSUF, No. 164)

4  At no time while inside the residence did Deputy Simonson ever

5  make any physical or verbal contact with the Plaintiff.  (DSUF,

6  No. 165)  He was not present during the initial entry and did not

7  observe the physical contact between Plaintiff and Officer

8  Garrison.  (DSUF, No. 166)  Plaintiff fails to offer any evidence

9  that Deputy Simpson's conduct was unreasonable.

10      Summary judgment in favor of Deputy Simpson is GRANTED.

11              (7)  Deputy Hollins

12      Deputy Hollins was one of the last officers to enter

13  Plaintiff's residence because he was assigned to the breaching

14  device that is used to force entry when necessary.  (DSUF, No.

15  180)  The breaching device requires two hands to carry so he did

16  not have a firearm in hand.  (DSUF, No. 181)  After securing the

17  residence but prior to conducting the search, Deputy Hollins

18  photographed the residence.  He also photographed the items and

19  locations from where they were seized.  (DSUF, No. 186)  He had

20  no physical or verbal contact with the Plaintiff the entire

21  duration of the search.  (DSUF, No. 187).  Plaintiff fails to

22  offer any factual dispute as to any unlawful conduct by Deputy

23  Hollins.

24      Summary Judgment in favor of Deputy Hollins is GRANTED.

25  B.   Freeman's *Monell* claim against the City of Fresno

26      To prevail on a § 1983 complaint against a local government

27  under *Monell*, a plaintiff must satisfy a three-part test:  (1)

28  The official(s) must have violated the plaintiff's constitutional

                                59

rights;[1] (2) The violation must be a part of policy or custom and may not be an isolated incident; and (3) A nexus must link the specific policy or custom to the plaintiff's injury.  *See Monell*, 436 U.S. at 690-92.  There are three ways to show a policy or custom of a municipality:

> (1)    By showing a longstanding practice or custom which constitutes the standard operating procedure of the local government entity;
>
> (2)    By showing that the decision-making official was, as a matter of state law, a final policymaking authority whose edicts or acts may fairly be said to represent official policy in the area of decision or
>
> (3)    By showing that an official with final policymaking authority either delegated that authority to, or ratified the decision of, a subordinate.

*Menotti v. City of Seattle*, 409 F.3d 1113, 1147 (9th Cir. 2005). A municipal policy may be inferred from widespread practices or evidence of repeated constitutional violations for which the errant municipal officers were not discharged or reprimanded. *Id.*

Plaintiff argues that Defendants' alleged constitutional violations were according to official or tacitly approved policy, practice and custom of the City of Fresno.  Plaintiff further

---

[1] "[A] public official is liable under § 1983 only if he causes the plaintiff to be subjected to deprivation of his constitutional rights.'" Brass, 328 F.3d at 1200 (quoting *Baker v. McCollan*, 443 U.S. 137, 142 (1979)(citation and internal quotation marks omitted)).  "'Section 1983 imposes liability for violations of rights protected by the Constitution, not for violations of duties of care arising out of tort law." *Brass*, 328 F.3d at 1200 (quoting *Baker*, 443 U.S. at 146).

argues that Defendants City of Fresno negligently hired, trained,

staffed, and supervised Defendant officers by failing to

adequately and properly supervise, control, and discipline them

for violating her Fourth Amendment rights.  However, Plaintiff

has not introduced evidence creating a material issue of fact as

to whether the Defendant officers were acting pursuant to a

municipal policy or custom.  Plaintiff disputes a number of facts

regarding the training requirements that the Police Department

requires its officers to undergo. Freeman disputes the following

facts:

1.   Officers employed with the Fresno Police
     Department are given training over and above that
     required by POST, (Peace Officer Standards and
     Training) the commission which regulates training
     for law enforcement officers in California.
     (DSUF, No. 229)

2.   The Fresno Police Department had training units
     that ensured that the officers employed by the
     Department received training in compliance with
     POST.  (DSUF, No. 230)

3.   The training provided to officers employed by the
     Department meets or exceeds POST guidelines.
     (DSUF, No. 231)

4.   Prior to February 19, 2004, the Fresno Police
     Department provided training to all their officers
     including those assigned to the M.A.G.E.C. Unit
     receive training on topics, including but not
     limited to: (1) the appropriate means and manner
     of conducting a search and seizure, in light of
     the totality of the circumstances faced by the
     officers; (2) proper use of force; (3) proper
     investigation and acquisition of search warrants.
     (DSUF, No. 232)

5.   New police officer recruits are required go
     through a field training program and are required
     to complete 24 hours of POST training every 24
     months.  They also undergo a rigorous sixteen week
     training program which includes training on the
     appropriate use of force, including lethal force.
     (DSUF, No. 233)

6.   Officers are also provided training in the use of
     force, including lectures and scenario-based
     performances.  The Fresno Police Department's
     policy regarding the use of force is part of the
     instruction given in any class in which the use of

61

force is reviewed.  (DSUF, No. 234)

7.   Plaintiff's retained police procedural matters
     expert, Roger Clark, has expressed his opinion in
     this case, the training provided by Fresno Police
     Department to its police officers is consistent
     with POST mandates.  (DSUF, No. 235)

8.   At all times relevant to this lawsuit, it has been
     the policy of the Fresno Police Department to
     conduct thorough internal investigations into
     allegations of misconduct by employees of the
     Department.  (DSUF, No. 238)

9.   It has also been the policy of the Fresno Police
     Department to take sufficient corrective action to
     prevent their employees from committing
     constitutional violations, or any violations of
     state or federal law.  (DSUF, No. 239)

10.  At no time relevant to this lawsuit has the Fresno
     Police Department had any policies, practices or
     customs of the following: (1) tolerating the use
     of excessive or unjustified force; (2) allowing
     constitutional violations by encouraging unlawful
     police activity, withholding or concealing
     material information from a search warrant; (3)
     performing pretextual investigations that
     vindicate and ratify an officer's misconduct; (4)
     taking insufficient corrective actions to prevent
     alleged patterns of constitutional violations from
     continuing; (5) delegation of obligations to
     manage, supervise, train and control officers;
     and/or (6) avoiding proper public oversight of the
     actions of officers. (DSUF, No. 240)

11.  The hiring process for new recruits with the
     Fresno Police Department includes, among other
     matters, obtaining a background check and a
     psychological evaluation of the applicant prior to
     hiring.  The applicant's propensity toward
     untruthfulness is tested and used as a basis of
     exclusion of potential applicants.  (DSUF, No.
     241)

12.  New recruits are required to undergo a rigorous
     sixteen week training program which includes
     training on the appropriate use of force.  (DSUF,
     No. 242)

Plaintiff does not offer evidence to create factual disputes in

this case to sustain Freeman's Fourth Amendment claim.  Freeman

merely denies that there was no policy or custom in place

tolerating the use of excessive force.  Freeman has not

1   established by any evidence that any conduct against her person

2   by any officer resulted from any *Monell* policy or pattern and

3   practice.  To the contrary, Plaintiff's expert agreed that Fresno

4   City Police Officer training meets or exceeds P.O.S.T. standards.

5   Freeman has no evidence that any alleged of rights violation was

6   the product of a pattern, practice, or policy of the City of

7   Fresno.  Plaintiff has submitted no affidavits or testimony that

8   establishes any disputed issues of fact that her alleged injuries

9   were the result of a longstanding practice or custom by the City

10  of Fresno to hire and keep "rogue cops" or failure to train its

11  officers.

12      Based on the totality of the record, and viewing the

13  evidence in the light most favorable to Plaintiff, there are no

14  material issues concerning the adequacy of training, hiring, and

15  supervisory measures of the City of Fresno in the administration

16  of its Police department.  Nor is there evidence that the City is

17  responsible for the training and supervision of M.A.G.E.C. or

18  that any M.A.G.E.C. practice or tactic violates the law or any

19  P.O.S.T. standard.

20      Defendants' motion for summary judgment as to Freeman's

21  *Monell* claim against the City of Fresno is GRANTED.

22  C.  State Law Claims Against Garrison, Yee, and City of Fresno

23      1.  Supplemental Jurisdiction Under 1367(a)

24      Title 28 U.S.C. section 1367(a) provides in pertinent part:

25  "In any civil action of which the district courts have original

26  jurisdiction, the district court shall have supplemental

27  jurisdiction over all other claims that are so related to the

28  claims in the action within such original jurisdiction that they

1  form part of the same case or controversy under Article III of
2  the United States Constitution."

3       Freeman alleges a § 1983 claim for Fourth Amendment
4  violations.  Freeman's state law claims invoke supplemental
5  jurisdiction and arise from the same facts in controversy in her
6  §1983 claim.

7           2.   California Tort Claims Act

8       In California, a person making a claim against a public
9  entity or a public employee must present such a claim in writing
10 to the clerk, auditor or secretary of the local public entity
11 within six months after the accrual of the cause of action.  Cal.
12 Gov. Code § 911.2.; see also *Javor v. Taggart*, 98 Cal. App. 4th
13 795, 804 (Cal. Ct. App. 2002) (submission of a claim to a public
14 entity pursuant to the California Tort Claims Act is a condition
15 precedent to a civil action against the state or its employees
16 and failure to present the claim bars the action.)  A person may
17 not maintain a cause of action against a public entity or public
18 employee without having first presented a claim as required by
19 California Statute.  Cal. Gov. Code 945.4.  Cal. Gov. Code
20 section 954.6 requires that a claimant file a civil action within
21 six months after the public agency issues its decision.  *Javor*,
22 98 Cal. App. 4th at 804.  Defendants concede that Plaintiff's
23 claim was timely filed.

24          3.   California Civil Code § 43 claims

25      California Civil Code § 43 states in relevant part, "Besides
26 the personal rights mentioned or recognized in the Government
27 Code, every person has, subject to the qualifications and
28 restrictions provided by law, the right of protection from bodily

1  restraint or harm from personal insult, from defamation, and from

2  injury to his personal relations."

3      There are no issues of disputed fact showing that Freeman

4  was subjected to bodily restraint, harm from personal insult,

5  defamation, or injury to her personal relations.

6      Summary Judgment is GRANTED in favor of Defendants on

7  Plaintiff's Civil Code § 43 claims.

8      4.   California Civil Code § 52.1

9      Cal. Civ. Code § 52 sets forth a damages remedy for civil

10  rights violations under California Law.  *Koebke v. Bernardo*

11  *Heights Country Club*, 36 Cal. 4th 824, 836 (Cal. 2004).  Civ.

12  Code § 52.1(a) provides that if a person interferes, or attempts

13  to interfere, by threats, intimidation, or coercion, with the

14  exercise or enjoyment of the constitutional or statutory rights

15  of an individual or individuals, a civil action may be brought

16  for equitable or injunctive relief.  *Venegas v. County of Los*

17  *Angeles*, 32 Cal. 4th 820, 841 (Cal. 2004).  Cal. Civ. Code §

18  52.1(b) allows any individual so interfered with to sue for

19  damages.  Id.  Cal. Civ. Code § 52.1(g) states that an action

20  brought under § 52.1 is independent of any other action, remedy

21  or procedure that may be available to an aggrieved individual

22  under any other provision of law.  *Id.*  To state a claim under

23  California Civil Code § 52.1, Plaintiffs must allege that the

24  interference with the plaintiff's rights by means of threats,

25  intimidation, or coercion was "because of" their membership in a

26  protected classification.  *Nelson v. City of Irvine,* 143 F.3d

27  1196, 1206 (9th Cir. 1998).

28      Here, although Plaintiff is African-American, she does not

1  allege that Defendants interfered with her legal rights due to

2  her particular membership in a protected class.

3      Summary judgment is GRANTED in favor of Defendants on

4  Plaintiff's California Civil Code § 52.1 claim.

5          5.   <u>California Civil Code § 51.7</u>

6      California Civil Code § 51.7(a) states:

7  "All persons within the jurisdiction of this state have the right

8  to be free from any violence, or intimidation by threat of

9  violence, committed against their persons or property because of

10 political affiliation, or on account of any characteristic listed

11 or defined in subdivision (b)[1] or (e)[2] of Section 51, or position

12 in a labor dispute, or because another person perceives them to

13 have one or more of those characteristics."

14     California Civil Code § 51.7 is a separate and independent

15 enactment referred to in § 52.1.  California Civil Code § 52.1(b)

16 makes persons who violate § 51.7 liable for actual and exemplary

17 damages.

18     Plaintiff does not bring claims against Defendants on a

19 theory that she suffered a constitutional deprivation because she

20 is a member of a protected class.

21 _____

22     [1] Cal. Civ. Code § 51(b) provides, "All persons within the
   jurisdiction of this state are free and equal no matter what
23 their sex, race, color, religion, ancestry, national origin,
   disability, medical condition, marital status, or sexual
24 orientation are entitled to the full and equal accommodations,
   advantages, facilities, privileges, or services in all business
25 establishments of every kind whatsoever."
26
27     [2] Cal. Civ. Code § 51(e) provides definitions for the terms
   "Disability," "Medical condition," "Religion," "Sex," and "Sexual
28 Orientation."

1    Summary Judgment is GRANTED in favor of Defendants  on

2  Plaintiff's California Civil Code § 51.7 claim.

3       6.   <u>Assault and Battery</u>

4    To establish civil assault, plaintiff would need to

5  establish that (1) the officers threatened to touch her in a

6  harmful or offensive manner (2) it reasonably appeared to her

7  that they were about to carry out the threat (3) she did not

8  consent to the conduct (4) she was harmed and (5) the officers'

9  conduct was a substantial factor in causing the harm.  CAL. PEN.

10  CODE § 240; *Tekle v. United States*, 457 F.3d 1088, 33 (9th Cir.

11  2006)

12    A civil battery claim requires that plaintiff show 1)

13  defendant intentionally did an act which resulted in a harmful or

14  offensive contact with the plaintiff's person, 2) plaintiff did

15  not consent to the contact, and 3) the harmful or offensive

16  contact caused injury, damage, loss or harm to the plaintiff.

17  CAL PENAL CODE § 242; *Tekle* 457 F.3d at 33; *Piedra v. Dugan*, 123

18  Cal. App. 4th 1483, 1495 (Cal. Ct. App. 2004)(internal quotations

19  omitted).  A battery is any intentional, unlawful, and harmful

20  contact by one person with the person of another.  *Id.*  A harmful

21  contact, intentionally done is the essence of a battery.  *Id*.  A

22  contact is unlawful if it is unconsented to.  *Id.*

23    The court in *Tekle* found that Plaintiff in that case raised

24  genuine issues of material facts regarding officers' engaging in

25  assault and battery.  *Tekle* 457 F.3d at 35. According to

26  Plaintiff's deposition in that case, an officer handcuffed

27  plaintiff while he was lying face down on the ground, then picked

28  him up by the chain of the handcuffs cutting his skin.  *Id.*  The

67

1   court noted that over twenty armed officers encountered a

2   barefoot, unarmed eleven year old Plaintiff who was not resisting

3   them.  *Id.*  Further, Plaintiff testified that the officers

4   continued to keep their guns trained upon him throughout the

5   incident and that one officer picked him up from behind by the

6   chain of the handcuffs.  *Id.*

7        Freeman's allegations, if believed, are that she offered no

8   resistance and there was no need to push her to the floor.

9        This requires that summary judgment be DENIED on Plaintiff's

10  state assault and battery claim.

11       7.   <u>False Imprisonment</u>

12       The basis for the tort of false imprisonment is the unlawful

13  restraint of another's liberty.  *Arpin v. Santa Clara Valley*

14  *Transp. Agency*, 261 F.3d 912, 920 (9th Cir. 2001.)

15       There are no facts to show that Plaintiff was restrained,

16  arrested, or confined in any way during the officers' execution

17  of the warrant.  While Plaintiff was unfortunately knocked over

18  during the execution of the warrant, the undisputed facts show

19  that, upon securing the perimeter, the officers assisted her onto

20  the couch and even allowed her to use the phone.  She was not

21  handcuffed or restrained in any way.  During the execution of a

22  search warrant, officers may keep persons on the premises in view

23  and from interfering with the search.  Plaintiff offered no

24  evidence she was unreasonably detained.

25       Summary Judgment is GRANTED in favor of Defendants as to

26  Plaintiff's false imprisonment claim.

27       8.   <u>Trespass to Land</u>

28       Trespass is an unlawful interference with possession of

                                68

1  property.  *Saples v. Hoefke*, 189 Cal. App. 3d 1397, 1406 (1987).
2  A police officer executing a valid search warrant may enter a
3  plaintiff's home.  *Brunette v. Humane Soc'y*, 294 F.3d 1205, 1210
4  (9th Cir. XXX)  Despite this privilege to enter, the police
5  officer's actions while executing the warrant must relate to the
6  objectives of the authorized intrusion.  *Id.*

7       The officers in this case entered Freeman's home pursuant to
8  a valid search warrant.  It is undisputed that Freeman's home was
9  listed and described with particularity in Attachment "A" to the
10 Search Warrant Affidavit.  (DSUF, No. 58)  The items to be seized
11 were also detailed in the warrant.  These items included evidence
12 of gang membership, firearms and ammunition, and were listed in
13 Attachment "B" to the Search Warrant Affidavit.  (DSUF, No. 59)

14      Summary judgment as to Plaintiffs claim for tresspass is
15 GRANTED in favor of Defendants.

16      9.   Intentional Infliction of Emotional Distress

17      Freeman asserts intentional infliction of emotional distress
18 against Defendant Officers.

19      To state a claim for intentional infliction of emotional
20 distress, a plaintiff must allege 1) extreme and outrageous
21 conduct by the defendant, with the intent or reckless disregard
22 of the probability of causing emotional distress 2) plaintiff
23 suffered severe emotional distress and 3) that defendant was the
24 cause of the emotional distress.  *Ess v. Eskaton Properties,*
25 *Inc.,* 97 Cal. App. 4th 120, 129 (Cal. Ct. App. 2002).  The
26 conduct must be extreme and outrageous, so as to be intolerable
27 in a civilized society.  *See, Tekle v. United States*, 457 F.3d
28 1088, 1103 (9th Cir. 2006).

69

1       Freeman's state claim for intentional infliction of

2  emotional distress by the officers fails to show evidence of

3  extreme and outrageous conduct in executing the search warrant.

4  Emotional distress damages are provable as part of Plaintiff's

5  § 1983 claim.  On the record presented, the officers' conduct was

6  not so extreme or outrageous to support a claim for intentional

7  infliction of emotional distress.

8       Summary Judgment in favor of Defendants is GRANTED.

9       10.  <u>Negligent Infliction of Emotional Distress</u>

10      To prove a claim for negligent infliction of emotional

11 distress a plaintiff mist show: 1) serious emotional distress, 2)

12 actually and proximately caused by 3) wrongful conduct 4) by a

13 defendant who should have foreseen that the conduct would cause

14 such distress.  *Austin v. Terhune*, 367 F.3d 1167, 1172 (9th Cir.

15 2004).  It is well settled that negligent infliction of emotional

16 distress is not an independent tort; rather it is the tort of

17 negligence to which the duty element applies.  *Marlene F. v.*

18 *Affiliated Psychiatric Med. Clinic, Inc.,* 48 Cal. 3d 583, 588

19 (Cal. 1989); *Friedman,* 107 Cal. App. 4th at 464;.

20      Where injury such as mental and emotional distress is caused

21 by the constitutional violation, that injury is compensable under

22 § 1983.  *Anderson v. Cent. Point Sch. Dist.*, 746 F.2d 505, 508

23 (9th Cir. 1984); *Carey v. Piphus*, 435 U.S. 247, 263-264 (1978).

24 Freeman's emotional distress claims are properly alleged under

25 her §1983 claim.  The circumstances of this case do not support a

26 claim for NIED.  Freeman was not a target of the search, the

27 officers had no animus as to her, and did not intentionally act

28 to cause her harm.

1    Freeman does not dispute that she has stress.  However,
2    according to the undisputed facts, this stress is the result of
3    her granddaughter living with her and does not result from the
4    officers' conduct.

5    Summary Judgment GRANTED in favor of Defendants on the
6    negligent infliction of emotional distress claim.

7                        VI.  CONCLUSION

8    •  Summary Judgment as to Detective Yee is GRANTED.

9    •  Summary judgment as to Sergeant Barrimond is DENIED.

10   •  Summary Judgment as to Officer Garrison is DENIED.

11   •  Summary Judgment as to Deputy Capriola is GRANTED in favor
12      of Defendants

13   •  Summary Judgment as to Deputy Simpson is GRANTED in favor of
14      Defendants

15   •  Summary Judgment as to Deputy Hollins is GRANTED in favor of
16      Defendants

17   •  Summary Judgment as to the City of Fresno is GRANTED in
18      favor of Defendants

19   •  Summary Judgment as to Plaintiffs claims under Cal. Civ.
20      Code §43 is GRANTED in favor of Defendants

21   •  Summary Judgment as to Plaintiffs claims under Cal. Civ.
22      Code  52.1 is GRANTED in favor of Defendants

23   •  Summary Judgment as to Plaintiffs claims under Cal. Civ.
24      Code  51.7 is GRANTED in favor of Defendants

25   •  Summary Judgment as to Plaintiffs claims for assault and
26      battery is DENIED.

27   •  Summary Judgment as to Plaintiffs claims for false
28      imprisonment is GRANTED in favor of Defendants

                              71

1   •     **Summary Judgment as to Plaintiffs claims for trespass to**

2         **land  is GRANTED in favor of Defendants**

3   •     **Summary Judgment as to Plaintiffs claims for intentional**

4         **infliction of emotional distress is GRANTED in favor of**

5         **Defendants**

6   •     **Summary Judgment as to Plaintiffs claims for negligent**

7         **infliction of emotional distress is GRANTED in favor of**

8         **Defendants**

9   IT IS SO ORDERED.

10  **Dated:   December 22, 2006**            **/s/ Oliver W. Wanger**
    dd0l0                                    UNITED STATES DISTRICT JUDGE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

72